EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
KERRY L. QUINN (Cal. Bar No. 302954)
Special Assistant United States Attorney
Major Frauds Section
TERRENCE P. MANN (Cal. Bar No. 211377)
Assistant United States Attorney
Santa Ana Branch Office
1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-5423 / (714) 338-3536
    Facsimile: (213) 894-6269 / (714) 338-3708
    E-mail:    Kerry.L.Quinn@usdoj.gov
               Terrence.Mann@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | SA CR No. 13-001(B)-AG |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | |
| MOMOUD AREF ABAJI, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Special Assistant United States Attorney Kerry L. Quinn and Assistant United States Attorney Terrence P. Mann, hereby files its sentencing position.

//

//

//

This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: August 30, 2016            Respectfully submitted,

                                  EILEEN M. DECKER
                                  United States Attorney

                                  LAWRENCE S. MIDDLETON
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                        /s/
                                  KERRY L. QUINN
                                  Special Assistant United States Attorney

                                  TERRENCE P. MANN
                                  Assistant United States Attorney

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

On February 5, 2016, a jury convicted defendant Momoud Aref Abaji ("defendant") of one count of conspiracy in violation of 18 U.S.C. § 1349, seven counts of wire fraud in violation of 18 U.S.C. § 1343, and two counts of tax evasion in violation of 26 U.S.C. § 7201.  The United States Probation Office ("USPO") filed an initial Presentence Report [docket no. 370] and an initial recommendation letter [docket no. 369] on April 18, 2016, and a revised presentence report ("PSR") [docket no. 389], an addendum [docket no. 390] and revised recommendation letter [docket no. 388] on July 12, 2016.  In the initial PSR and letter, the USPO recommended a custodial sentence at the low-end of the guideline range, or 135 months, and in the revised PSR, the USPO revised its recommendation to 121 months, which would represent a one-level downward variance.  The government concurs in the USPO's guideline calculation, resulting in a guideline range of 135 to 168 months.  The government also concurs with the USPO's initial recommendation of 135 months custody followed by a five year term of supervised release, an $800 special assessment, and a restitution order for $10,047,272.  Unlike the USPO, the government does not believe a downward variance is warranted in this case.

**II.    STATEMENT OF FACTS**

From approximately November 2007 to approximately July 2009, defendant and others participated in a scheme to defraud mortgage lenders by inducing them to fund loans based on the submission of false information on loan applications.  Two of defendant's co-conspirators, Mohamed Salah ("Salah") and defendant's younger brother Maher Obagi ("Obagi"), were convicted of crimes related to this

scheme after a jury trial in March 2015. (PSR ¶¶ 7, 11.) Three other co-conspirators - Ali Khatib ("Khatib"), Jacqueline Burchell ("Burchell") and Mohamed El Tahir ("El Tahir") - pled guilty to related crimes and agreed to cooperate with the government. (PSR ¶¶ 9, 10, 12.) Charges against El Tahir were dismissed after he was killed in an unrelated incident. (PSR ¶ 10.)

The Conspiracy

The scheme operated substantially the same from 2007 to 2009:

Defendant and his co-conspirators would identify newly-built, multi-unit condominium properties, including properties located in Florida, California, and Arizona, in which the builder-sellers ("sellers") were struggling to sell the properties, and the co-conspirators would make arrangements to broker the sale of these properties in exchange for a large undisclosed kickback, which they would misleadingly call a "commission" or "marketing fee." (PSR ¶ 23.)

Through the scheme, the co-conspirators would purchase, and cause the purchase of, condominium units for themselves, their close relatives, and individuals with good credit scores who were recruited to serve as purchasers (collectively, "straw buyers"). In total, the co-conspirators purchased or caused the purchase of more than 100 condominium units at inflated prices. (PSR ¶ 24.)

Defendant would recruit straw buyers by presenting the purchase of the condominium units as an investment opportunity that did not require any money down or any mortgage payments for a specified time period, and by promising the straw buyers that the co-conspirators would manage the condominium units for them, renting them out, and using the rental income to make mortgage payments on the straw

buyers' behalf.  (PSR ¶ 25.)  The benefit to the straw buyer was to be an upfront fee, as well as possible profits when the properties were resold in the future.  (PSR ¶ 25.)

The co-conspirators would further identify mortgage lenders, including federally chartered and insured depository institutions, to fund mortgages for the purchase of the condominium units in the straw buyers' names, and would prepare and submit loan applications on behalf of the straw buyers.  (PSR ¶ 26.)

The co-conspirators would include materially false and misleading information in the loan applications about the buyers' employment, income, assets, liabilities, and ability to make a down payment toward the purchase of the properties.  (PSR ¶ 27.)  The co-conspirators would falsely represent to the mortgage lenders that the straw buyers had made significant down payments toward the purchase of the properties when in fact the straw buyers had contributed nothing toward the purchase and in many cases received money from the transaction.  (PSR ¶ 29.)

The co-conspirators would simultaneously submit loan applications to different mortgage lenders for the purchase of multiple properties in the name of the same straw buyers, concealing from each mortgage lender the buyer's multiple loan applications and liabilities.  (PSR ¶ 30.)

Salah and others working at defendant's and Obagi's direction would create fraudulent documents, including fabricated and altered W-2 forms, pay stubs, and bank statements, to support the false information in loan applications.  (PSR ¶ 28.)  As the Court heard in trial, defendant himself fabricated documents to be submitted as part of loan applications.

Obagi and El Tahir would take steps to make it appear that fictitious companies were real businesses so that the co-conspirators could list these fictitious companies on loan applications as sham employers for the straw borrowers. (PSR ¶ 32.) Similarly, El Tahir would purchase prepaid cell phones to have numbers to list for the sham companies on loan applications. Defendant, Obagi and Salah would answer those cell phones and pretend to be employer representatives when mortgage lenders would call to verify information. (PSR ¶ 33.)

Defendant and other co-conspirators would conceal from the mortgage lenders significant kickbacks - misleadingly called "marketing fees" and commissions - paid by the sellers to the defendants and their co-conspirators in connection with the purchase of these properties. (PSR ¶ 34.)

Burchell, the escrow officer, facilitated the scheme by creating two versions of HUD-1s (or closing statements) provided to the mortgage lenders. The false HUD-1s, labeled "estimated," would conceal from the mortgage lenders the significant kickbacks that builders were paying to the defendants. (PSR ¶ 36.) In many of the transactions, the kickbacks totaled $50,000 to $100,000, or more, on properties whose list price was less than $300,000. (PSR ¶ 36.)

Burchell would provide the false or "estimated" HUD-1s to the mortgage lenders in advance of and at closing. Immediately after the deal closed, or as it was preparing to close, Burchell would alter the false or "estimated" HUD-1s to create accurate, "final" HUD-1s, which she maintained in her files, but did not disclose to the mortgage lenders. If the mortgage lenders asked for the "final" HUD-1, Burchell ignored the requests. (PSR ¶ 37.)

At the beginning of the scheme, Obagi instructed Burchell not to let the lenders know about the kickbacks that the builders were paying to the co-conspirators. For most of the properties, Burchell would provide the co-conspirators a significant portion of the funded loan amount directly out of escrow. Once the deal closed, they would divide the proceeds, paying themselves, making some mortgage payments, and making payments to the straw buyers. (PSR ¶ 38.)

Florida Properties

In furtherance of the conspiracy, defendant and his co-conspirators committed the following overt acts involving a development in Kissimmee, Florida.

In November and December 2007, defendant negotiated a "marketing agreement" with the builder of a development in Kissimmee, Florida (the "Kissimmee builder"), whereby the Kissimmee builder agreed to pay defendant and his co-conspirators a kickback (misleadingly termed a "marketing" fee) of approximately $88,000 per unit sold. (PSR ¶ 40.)

On December 21, 2007, defendant received an email from a representative of the Kissimmee builder, which stated that the Kissimmee builder would make "marketing" payments to defendant at the close of each property sale. (PSR ¶ 41.)

On January 11, 2008, D.H. received a Washington Mutual Bank official check in the amount of $35,934.19, which D.H. deposited into D.H.'s Wells Fargo Bank account number XXXX4487. (PSR ¶ 42.)

On January 15, 2008, $35,934.19 was wired from D.H.'s Wells Fargo Bank account number XXXX4487 to a title company, with the notation, "Purchase down payment," relating to the purchase of

property at XX87 Town Terrace North from the Kissimmee builder.  (PSR ¶ 43.)

### California Properties

In furtherance of the conspiracy, defendant and the co-conspirators committed the following overt acts involving a development in Antelope, California.

In August 2008, defendant negotiated an agreement with the builder of a condominium development at XX34 Walerga Road in Antelope, California (the "Antelope builder"), whereby the Antelope builder agreed to pay defendant and his co-conspirators a kickback (misleadingly termed a "credit") of approximately $84,000 to $90,000 per unit sold.  (PSR ¶ 45.)

On September 10, 2008, Obagi signed a loan application to lender Greenlight Financial Services related to the purchase of condominium Unit 128 from the Antelope builder, where the loan application contained false information about Obagi's income, assets, and liabilities.  (PSR ¶ 46.)

On September 11, 2008, Burchell prepared a HUD-1, marked "Estimated," which related to Obagi's purchase of condominium Unit 128 from the Antelope builder.  This "Estimated" HUD-1, which was submitted to mortgage lender Greenlight Financial Services, falsely reflected a down payment of approximately $46,280 from Obagi as the borrower, and falsely reflected no cash paid to the borrower and no "credit from seller to buyer."  (PSR ¶ 47.)

On September 12, 2008, Burchell prepared a HUD-1, marked "Final," which related to Obagi's purchase of condominium Unit 128 from the Antelope developer.  This "Final" HUD-1, which was not submitted to mortgage lender Greenlight Financial Services but was

6

maintained in Burchell's files, reflected no down payment from Obagi as the borrower, reflected cash paid to Obagi of approximately $37,591, and reflected a "credit from seller to buyer" of $84,000. (PSR ¶ 48.)

On September 12, 2008, defendant caused, or aided in the transmission of, a wire transfer via a Fedwire server located in New Jersey of $155,083 from Greenlight Financial Services' Texas Capital Bank account to California Counties Title Co. Professional Business Bank account, number XXXX9119, in Pasadena, California, to fund Obagi's purchase of XX34 Walerga Road, Unit 128, in Antelope, California (this wire transfer is charged in Count 2 of the FSI). (PSR ¶ 49.)

On November 3, 2008, defendant caused, or aided in the transmission of, a wire transfer via a Fedwire server located in New Jersey of $96,809 from POI Financial Corp Impresa Account number XXXX7622, in Houston, Texas, to EscrowQuick's Comerica Bank account, number XXXX8933, in El Segundo, California, to fund borrower N.K.'s purchase of XX34 Walerga Road, Unit 138, in Antelope, California (this wire transfer is charged in Count 3 of the FSI).  (PSR ¶ 50.)

On February 6, 2009, Salah's Washington Mutual/Chase Bank statement for the month of December 2008, account number XXXX4698, was submitted to mortgage lender Bank of America in support of straw buyer R.D.'s loan application for the purchase of condominium Unit 531 from the Antelope builder.  Salah's account statement was altered to reflect that R.D. was the account owner and to increase the true account balance from approximately $433 to approximately $84,388. (PSR ¶ 51.)

On March 5, 2009, defendant caused, or aided in the transmission of, a wire transfer via a Fedwire server located in New Jersey of $178,701 from HSBC Mortgage Corp.'s HSBC Bank account, number XXXX1584, in Depew, New York, to EscrowQuick's Comerica Bank account, number XXXX8933, in El Segundo, California, to fund borrower D.H.'s purchase of XX34 Walerga Road, Unit 134, in Antelope, California (this wire transfer is charged in Count 5 of the FSI).  (PSR ¶ 52.)

On March 16, 2009, defendant caused, or aided in the transmission of, a wire transfer via a Fedwire server located in New Jersey of $161,978 from HSBC Mortgage Corp.'s HSBC Bank account, number xxxx1584, in Depew, New York, to EscrowQuick's Comerica Bank account, number XXXX8933, in El Segundo, California, to fund borrower R.D.'s purchase of XX34 Walerga Road, Unit 825, in Antelope, California (this wire transfer is charged in Count 6 of the FSI). (PSR ¶ 53.)

Arizona Properties

In furtherance of the conspiracy, defendant and the co-conspirators committed the following overt acts involving developments in Phoenix, Arizona.

In June 2009, Tbakhi's Wells Fargo Bank statement for the month of April 2009, account number XXXX5903, was submitted to mortgage lender Wells Fargo Home Mortgage in support of straw buyer A.E.'s loan application for the purchase of property at XX30 East Lakewood Parkway, Unit 1092, in Phoenix, Arizona.  Tbakhi's bank statement was altered to falsely reflect that A.E. was the account owner.  (PSR ¶ 55.)

On July 10, 2009, El Tahir's Washington Mutual/Chase Bank statement for the month of May 2009, account number XXXX7399, was

8

submitted to mortgage lender Bank of America in support of straw buyer J.S.'s loan application for the purchase of property at xxx13 South Desert Foothills Parkway, Unit 1116, in Phoenix, Arizona. El Tahir's account statement was altered to falsely reflect that J.S. was the account owner and to increase the true account balance from approximately $1,827 to approximately $96,221. (PSR ¶ 56.)

On July 15, 2009, defendant caused, or aided in the transmission of, a wire transfer via a Fedwire server located in New Jersey of $218,879 from Bank of America's Brea Loan Line Funding account, number XXXX7447, in Charlotte, North Carolina, to EscrowQuick's Comerica Bank account, number XXXX8933, in El Segundo, California, to fund borrower J.S.'s purchase of xxx13 S. Desert Foothills Parkway, Unit 1116, in Phoenix, Arizona (this wire transfer is charged in Count 7 of the FSI). (PSR ¶ 57.)

<u>Losses</u>

Defendant and his co-conspirators purchased, or caused the purchase of, at least 100 properties through the scheme, with twelve mortgage lenders and secondary mortgage purchasers ("victims") suffering $10,047,272 in losses as a result of the scheme. (PSR ¶ 58.)

<u>Victim Impact</u>

One of the victims submitted a victim impact statement, verifying its losses and stating that the fraud scheme that defendant committed and other similar schemes were devastating to the company and the mortgage industry. The lender further stated that because of the type of fraud scheme in which defendant engaged, mortgage lenders have been compelled to add many additional layers of audits and re-verifications of the mortgage loan process, making it more difficult

and time consuming for consumers to obtain home loans. (PSR ¶¶ 71-72.)

### Tax Evasion – Tax Year 2008 (Count 8 of the FSI)

During the calendar year 2008, defendant received taxable income of at least $92,300, and upon that taxable income owed the United States an income tax of approximately $22,698. (PSR ¶ 60.)

Beginning in January 2008 and continuing to December 11, 2012, defendant attempted to evade and defeat a substantial part of the income tax due and owing by him to the United States for the calendar year 2008 by failing to file an income tax return on or before April 15, 2009, and by concealing and attempting to conceal his true and correct income. (PSR ¶ 61.)

Specifically, beginning on January 1, 2008, and continuing through December 31, 2008, defendant directed his employer Excel to make his paychecks payable to defendant's father and others. (PSR ¶ 62.)

Beginning on March 3, 2008, and continuing through December 3, 2008, defendant deposited his paychecks into another person's bank account, namely, Obagi's Bank of America account, account number XXXX6812. After the paychecks were deposited, defendant took possession of a portion of the funds through cash withdrawals and other means. (PSR ¶ 63.)

On October 25, 2012, after being questioned by law enforcement about his failure to pay income taxes for the calendar year 2008, defendant submitted to the Internal Revenue Service ("IRS") a joint 2008 U.S. Individual Income Tax Return, Form 1040, which falsely reported on line 22 that defendant had a total income of $18,917 for 2008, when his total income for that year was substantially higher

than the amount he reported.  After the IRS returned this Form 1040 to defendant for signatures, on December 11, 2012 defendant resubmitted the Form 1040 with a written declaration from him that it was made under penalty of perjury, again falsely reporting on line 22 that defendant had a total income of $18,917 in the calendar year 2008, when his total income for 2008 was substantially higher than the amount he reported.  (PSR ¶ 64.)

Tax Evasion - Tax Year 2009 (Count 9 of the FSI)

During the calendar year 2009, defendant had and received a taxable income of at least $82,744, and upon that taxable income owed the United States an income tax of approximately $18,782.  (PSR ¶ 65.)

Beginning in January 2009, and continuing to July 13, 2013, defendant attempted to evade and defeat a substantial part of the income tax due and owing by him to the United States for the calendar year 2009 by failing to file an income tax return on or before April 15, 2010, and by concealing and attempting to conceal his true and correct income.  (PSR ¶ 66.)

Specifically, beginning on January 1, 2009, and continuing through September 1, 2009, defendant directed his employer, Excel Investments, to make his paychecks payable to defendant's father and others.  (PSR ¶ 67.)

Beginning on January 8, 2009, and continuing through September 1, 2009, defendant deposited his paychecks into another person's bank account, namely Obagi's Bank of America account, account number XXXX6812.  After the paychecks were deposited, defendant took possession of a portion of the funds through cash withdrawals and by causing checks written on Obagi's Bank of America account, account

number XXXX6812 to be made payable to "Obagi for Real Estate," a business that defendant controlled, and to defendant, which checks defendant then cashed or deposited into his personal bank account. (PSR ¶ 68.)

On July 17, 2013, after being questioned by law enforcement about his failure to pay income taxes for the calendar year 2009, and after learning that he was being investigated by the IRS relating to his evasion of income taxes, defendant submitted a 2009 U.S. Individual Income Tax Return, Form 1040, which was verified by a written declaration by defendant that it was made under penalty of perjury, which falsely reported on line 22 that defendant had total income of $1,669, when, as defendant then well knew and believed, his total income for 2009 was substantially higher than the amount he reported. (PSR ¶ 69.)

In total, had defendant properly reported his income on the Form 1040s for the tax years 2008 and 2009, he would have been assessed an individual income tax of at least $41,480. (PSR ¶ 70.)

**III. ARGUMENT**

"Sentencing proceedings are to begin by determining the applicable Guidelines range." United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). The range is "the starting point and the initial benchmark." Id. However, it is also well established that "every judge is at liberty to vary from that range." United States v. Mitchell, 624 F.3d 1023, 1030 (9th Cir. 2010). Thus, the Court has discretion under United States v. Booker, 543 U.S. 220 (2005), and Kimbrough v. United States, 552 U.S. 85 (2007), to sentence outside of the guideline range.

A guideline sentence is appropriate in this case. As set forth in the PSR, the guideline range for this case is 135 to 168 months. A sentence at the low end of the guideline range, or 135 months, is sufficient but not greater than necessary to achieve the sentencing goals of 18 U.S.C. § 3553(a).

First, the crimes that defendant committed are serious. Defendant was one of the masterminds of a massive fraud scheme that caused more than $10,000,000 in losses to more than ten different mortgage lenders. The fraud scheme preyed upon a vulnerable mortgage industry in a time where the housing market was already reeling from the 2008 financial crisis. This type of scheme, called a builder-bailout scheme, prolonged and worsened the housing meltdown at the center of the financial crisis by keeping housing prices artificially inflated even after the market downturn, and then deepening losses that mortgage lenders suffered when condominium units needed to be sold at a fraction of the loan amounts that had financed their purchase. Meanwhile, as the economy was in a tailspin, defendant and his co-conspirators made millions of dollars from fraudulent mortgage loans that they brokered, without putting any of their own money down and using straw borrower's names and credit. In this way, defendant made money without investing anything of his own or putting his own credit at risk.

Many of the straw borrowers were not so lucky. The Court heard testimony from several straw buyers at the trial in this case, including elderly individuals such as R.D. and D.H., who testified about how they were brought into the scheme. Defendant specifically recruited R.D., taking advantage of an old family friend, and putting him into investments that defendant knew were fraudulent, which has

resulted in R.D. suffering large financial losses as he has struggled to make payments on inflated loans that were taken out in his name. The Court may also recall the testimony of D.H., an elderly woman who worked as a secretary in a mobile home park where she lived. She testified that she did not even understand the investment and did not understand that she was being asked to purchase properties in her name. She explained that, after the loans went into default, her credit was ruined.

Second, a substantial sentence is needed for deterrent purposes and to promote respect for the law. Not only did defendant plan and carry out a massive fraud scheme, he also took advantage of the American tax system, committing tax evasion with respect to the returns that he filed for 2008 and 2009 – in part, to cover up his other criminal conduct. Simply put, defendant repeatedly lied to and deceived others, demonstrating a complete lack of respect for the rule of law and the norms of our society. A substantial prison sentence will send the message to defendant and others considering such conduct that mortgage fraud is taken seriously in this District and punished accordingly.

Third, the history and characteristics of this defendant warrant a substantial prison term. For his part in the scheme, defendant was the master negotiator, traveling around the country and convincing large condominium developers to enter into illegal agreements with him. As noted above, he also recruited innocent individuals to act as straw borrowers, ruining their credit in the process. The Court may also remember from witness testimony at trial that defendant played a hands-on role in fabricating documents for the charged fraud scheme - defendant was literally observed standing over a copier

cutting and pasting financial documents to be submitted to mortgage lenders.  In sum, defendant was involved in every part of the scheme, being one of the masterminds of it, negotiating the key agreements with developers, and submitting fraudulent documents to lenders.  He both organized the scheme and supervised others in executing it.  As both a leader and one of the organizers of the scheme, defendant deserves a sentence of at least 135 months in custody.  A sentence in the guideline range is clearly warranted in this case.

**IV.  RESTITUTION**

In addition to the period of incarceration, defendant should be ordered to make full restitution to the victims of his crimes.  The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A and § 3664, applies to "an offense against property under this title . . . including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii).  Under the MVRA, a district court must order restitution in such a case where "an identifiable victim or victims has suffered a . . . pecuniary loss."  18 U.S.C. § 3663A(c)(1)(B).  With this statutory background, this Court is required to impose an order of restitution in this case in favor of the victims for the full amount of their losses, without consideration of the defendant's ability to pay that amount. 18 U.S.C. § 3664(f)(1)(A); USSG § 5E1.1 (directing the sentencing court to enter a restitution order if there is an identifiable victim).

As set forth in the PSR, defendant caused losses of $10,047,272 to the bank victims listed in the PSR, and he should be ordered to pay restitution to those victims.  The government is not seeking restitution for the tax losses caused by the tax fraud offenses charged in Counts Eight and Nine of the FSI.

15

## V.  CONCLUSION

For the reasons set forth above, the government recommends that the Court order a prison term of 135 months, a 5-year term of supervised release, and an $800 special assessment, and that it issue a restitution order requiring payment of $10,047,272.

Dated: August 30, 2016          Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


      /s/
KERRY L. QUINN
Special Assistant United States Attorney

TERRENCE MANN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA