ROBINSON D. HARLEY, JR. SBN: 68984
Attorney At Law
825 N. Ross Street
Santa Ana, CA 92701
P: (714) 972-8141
F: (714) 972-8107
E-mail: rob.harley@sbcglobal.net

Attorneys for Defendant
MOMOUD AREF ABAJI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | **Case No.** SA CR 13-00001-AG |
| Plaintiff, ) | **FIRST SUPPLEMENTAL TO MOTION FOR NEW TRIAL** |
| vs. ) | |
| MOMOUD AREF ABAJI, ) | |
| Defendant. ) | |

Defendant MOMOUD AREF ABAJI by and through his counsel of record Robinson D. Harley moves to submit First Supplemental to motion for new trial.

Dated: December 29, 2017                             Respectfully Submitted,


                                                                                 By:     /S/
                                                                                        Robinson D. Harley, Jr.
                                                                                        Attorney for Defendant

# TABLE OF CONTENTS

1. COUNSELS CROSS EXAMINATION OF ALI KHATIB WAS INEFFECTIVE

2. COUNSEL'S FAILURE TO TIMELY OBTAIN THE MARCH 2015 TRIAL TRANSCRIPTS AND HIS FAILURE TO CALL ANY DEFENSE WITNESSES INCLUDING BUT NOT LIMITED TO DIANNA HARRISON, NICOLE MASHINI, TONY ASSALI, LORRAINE THIBODEAU, AND NARIMAN KHATIB CONSTITUTE INEFFECTIVE ASSISTANCE OF COUNSEL

3. BECAUSE COUNSEL WAS IGNORANT OF THE CONTENTS OF BURCHELL'S MARCH 2015 TRIAL TESTIMONY HE RENDERED INEFFECTIVE CROSS-EXAMINATION OF BURCHELL IN JANUARY 2016 TRIAL

4. COUNSEL'S FAILURE TO CALL ATTORNEY WINSTEN TO IMPEACH AGENT CAMPBELL'S TESTIMONY ABOUT DEFENDANT'S KNOWLEDGE AND THE FAKE W-2'S AND 1099'S CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL

5. CONCLUSION

## I.

## COUNSELS CROSS EXAMINATION OF ALI KHATIB WAS INEFFECTIVE

After testifying about his cooperation agreement, Khatib testified that he was taking ADHD medication, adderall and clonazepam for anxiety during 2008 and 2009; IV[1], 139. During 2008 and 2009 defendant was drinking five days a week and five drinks per day; IV, P. 140. Khatib stopped drinking in 2009 when he got convicted of DUI and went to Jordan taking one million dollars with him and bringing the money back in 2010-2011 after earning 10% interest; IV, 141-142. Defendant was a loan officer, not a loan processor. Defendant worked five days a week 8-5PM. Defendant stopped working in 2009; IV, 113, 145-146. Khatib was working only 2-4 hours per day as he drank five days per week, at least 5 drinks per day; IV, p. 174. It was not possible defendant had second job and defendant got 10% of gross revenue. Defendant was doing builder bailout schemes full-time; IV, 147

Cross examination covered Khatib's plea agreement, his relation with Nicole Mashini, his work history once coming to the U.S., his relationship with Wajieh Tbakhi, his subprime business and his business relationship with defendant as loan officer and the fact that in 2009 he took a million dollars to Jordan and earned 10% and brought it back to put in her sister-in-laws name and her company called, Ideal Tax Solutions; IV, 191-248. Khatib admitted that he took money to Jordan to protect his money from the investigation but denied trying to avoid leaving a paper trail. Khatib gave $10,000 to defendant give to Maher; V, 4-16.

Khatib was never cross examined on the effects of five drinks daily, on his memory, his judgment, and his perception. He was never cross examined on the effects of Clonazepam, on his memory, his perception, his anxiety, and his self-

---

[1] The Reporter's Transcript of defendant's jury trial consists fo eight volumes. Designations will be notes by volume number, I. II, III, IV, V, VI, VII, VIII; followed by relevant page number.

3

control. Finally, Khatib was never cross-examined on the combined effects of his anti-anxiety medication and alcohol.  Moreover, Khatib was never cross-examined about his attention deficit hyperactivity disorder and the amphetamine medication called adderall that he was taking in spite of medical warning not to mix adderall with alcohol.

During cross examination of the defendant's trial, Khatib testified to taking one million out of the U.S., letting it sit in an account earning 10% interest then brining it back to the U.S., he was trying to hide money because he knew he committed bank fraud, he started a new business when he brought the money back into the U.S. Khatib knew he could be charged with multiple counts of fraud , money laundering, and tax fraud and was concerned about going to prison for a long time so he hired an attorney and within a week he was calling to the FBI.

**CO-DEFENDANT'S TRIAL TESTIMONY - 3/2015**

Khatib had numerous discussions with the FBI and never said anything about defendant proposing to use his brother Maher in the $10,000 payment; Co-d[2], Vol. II, p. 14 - 15.  Defendant negotiated the marketing agreements but Khatib signed them. Co-d, Vol. II, p. 32.  Khatib testified that after he moved to Irvine he was only in the office 2 to 4 hours a week.  He was working 5 days a week and taking anti-anxiety medication.  Khatib didn't see that the combination of alcohol and drugs affected his

---

[2]     Khatib testified at the March 2015 co-defendant trial. His testimony is contained in Day 3, 3/12/15, Vol. I; Day 3, 3/12/15, Vol II; Day 4, 3/13/15, Vol. I; and Day 4, 3/13/15, Vol. II. References to the record will refer to Day 3, 3/12/15, Vol. I, as Co-d, Vol. I, followed by the relevant page number. References to Day 3, 3/12/15, Vol. II, will be referred to as Co-d, Vol. II, followed by the relevant page number. References to Day 4, 3/13/15, Vol I, will be referred to as Co-d, Vol. III, followed by the relevant page number. References to Day 4, 3/13/15, Vol. II, will be referred to as Vol. IV, followed by the relevant page number.

memory; Co-d, Vol. II, p. 57-58. Khatib never filled out any currency reports with U.S. Customs or Jordan when he moved his one million dollars outside and back to the U.S.; Co-d, Vol. I, p. 69.

During cross examination, Khatib confessed to taking the lions share of the profits from his company; Co-d, Vol. I, p. 77. Khatib ran the company and had the final say although others were involved in company decisions. Defendant's brother had control with Khatib over most of the company bank accounts; Co-d, Vol. I, pp. 77-78. Khatib had signing authority on all accounts while his brother had signing authority on one account; Co-d, Vol. I, p. 79. Khatib never reported the one million he sent to Jordan and sent back to the U.S. He knew that was a crime and he did it to hide money because he committed bank fraud and the money was the proceeds of his bank fraud; Co-d, Vol. I, pp. 83-86. Part of his money was invested in a company to friends and his family name called Ideal Tax Solution. Khatib knew the Feds couldn't seize his money because other family member invested in business; Co-d, Vol. I, pp. 87-91.

Khatib told his attorney that "he couldn't live with this and is there any way he could talk to the FBI about it." Co-d, Vol. I, p. 99 "[He] didn't feel good at all about doing all that;" Co-d, Vol. I, p. 100. Khatib was aware of the fraud going on before he wrote to the FBI; Co-d, Vol. I, p. 101. If you've admitted a mistaken, the best approach is to talk to FBI; Co-d, Vol. I, p. 105. Khatib's excuse was he was not happy with himself, he was having nightmares and talking about it and admitting it made him feel better; Co-d, Vol. I, p. 107. His statements to FBI was the truth; Co-d, Vol. I, p. 111.

Kissimmee marketing agreements were negotiated by defendant and signed by Khatib; Co-d, Vol. II, pp. 32-34. Bridgefield Properties was signed by Khatib for 12 properties; Co-d, Vol. II, p. 35. Khatib didn't file his 2009 tax returns until September 11, after he started cooperating with FBI; Co-d, Vol. III, pp. 87-88. Khatib's tax return for 2009 showed a total income of $44,500 plus dividend income

of $310,000; Co-d, Vol. III, p. 96. Khatib claimed a $266,000 business loss after reporting $600,000 in gross receipts and $855,000 expenses for unexplained capital loan repayment; Co-d, Vol. III, pp. 100, 110-116. Besides committing bank fraud and false loan applications he entered the U.S. in 1987 on a student visa and never went to school. Khatib caused many false loan application to be submitted to the banks and asked his wife to co sign the fraudulent Bridgefield loan document; Co-d, Vol. III, pp. 117-121. Khatib signed an agreement to tell the truth and assist as long as he says the truth. If he gets caught lying the agreement would be cancelled; Co-d, Vol. III, p. 123. AUSA will decide if telling truth; Co-d, Vol. III, pp. 124-125. Khatib attended a few management lunches at the Irvine office; Co-d, Vol. III, p. 127. His dads cancer and surgery put stress on him besides the subprime market going away; Co-d, Vol. III, p. 132. Khatib used marijuana starting in 2011 and drank alcohol regularly in 2008-2009. He was taking anxiety pills as needed; Co-d, Vol. III, pp. 133-135.

When Khatib came back from Jordan, he put $150,000 into his starter Company and $700,000 went to purchase a $700,000 Newport Beach condo for his wife in his sister-in-laws name; Co-d, Vol. III, pp. 137-138. Khatib bought a million dollar home in Newport Beach in 2005 but had cash flow problems from 2005-2007 and he lost all his money and had to sell his Anaheim home. From 2007-2008, and 2009 he was paying his mortgage. Cash flow was important; Co-d, Vol. III, pp. 142-144. Khatib drove a Range Rover and Mercedes S 550 during the 2007-2009 period; Co-d, Vol. III, p. 147. Khatib assisted federal prosecution in another unrelated case; Co-d, Vol. III, p. 148. He wore a body wire in that case; Co-d, Vol. III, p.148.

Khatib felt very bad about the situation for some period of time Christina Snyder called and told Khatib that the FBI contacted her. One week later Khatib contacted his attorney. He got different advice from his attorney but it wasn't for another two years until he went to law enforcement and confessed; Co-d, Vol. III, pp. 156-157.

Maher Obaji yelled at defendant for trusting in a buyer that was not qualified

and for not finding more qualified buyers and telling them we have to fabricate or make paperwork; Co-d, Vol. IV, p. 11. This conversation happened in April -May 2009; Co-d, Vol. IV, p. 20-21.

## II.
## COUNSEL'S FAILURE TO TIMELY OBTAIN THE MARCH 2015 TRIAL TRANSCRIPTS AND HIS FAILURE TO CALL ANY DEFENSE WITNESSES INCLUDING BUT NOT LIMITED TO DIANNA HARRISON, NICOLE MASHINI, TONY ASSALI, LORRAINE THIBODEAU, AND NARIMAN KHATIB CONSTITUTE INEFFECTIVE ASSISTANCE OF COUNSEL

**Diana Harrison:**

Diana Harrison met Khalib in 2007-2008. She also met defendant. Harrison let defendant use her credit and defendant stated Harrison had good credit and would be able to work on this project. A couple of weeks later a young woman showed up with a stack of documents which Harrison signed. Two weeks later a young man came by to take Harrison to her bank so she could deposit a check; Co-d, Vol. IV[3], pp.24-35. Following an investment presentation, Harrison asked Khatib if this was legal. Khatib said everything is taken care of and Khatib had a lawyer review the paperwork and everything was legal and that his lawyer had approved it. She relied on his representation to decide to invest in Khatib's company. When she invested in Khatib's company she relied on Khatib's attorneys advice and believed that everything she did was legal; Co-d, Vol. IV, pp. 63-67.

The defendant was relying on advice of counsel and documents provided by Khatib's counsel; yet his attorney was ignorant of Harrison's March 2015 trial testimony and was ineffective in developing any evidence approving the advice of counsel good faith defense instruction pursuant to No. 5.9 (9th Circuit Model Jury Instructions).

---

[3] Vol. IV, followed by the relevant page number refers to Day 4, Vol. II, 3/13/15, of the Co-defendant's jury trial.

7

**Nicole Mashini:**

Nicole Mashini met defendant and Khatib who offered her a job at Capital Zone. She searched the internet for single family homes. She denied ever telling Khatib or anybody else that they could buy a large number of units from developers in Florida and receive a marketing fee, commission, kickback from the builder; Co-d, Vol. V[4], pp. 4-9. She never observed any conduct that was fraudulent or illegal; Co-d, Vol. V, p. 12

Counsel was ignorant of Mashini trial testimony of March 2015 and inexplicably, for no tactical reason never called her during the defense case in defendant's January 2016 trial in order to prove defendant's innocence.

**Tony Assali:**

Tony Assali was the owner of Escrow Quick and hired Burchell as an escrow officer in 2007. Khatib contacted Assali about having Escrow Quick do escrow s on a large number of condominiums. Assali was suspicious of Khatib and he warned Burchell about working for Khatib. Assali denied ever discussing with Khatib anything about concealing the sources of any down payment for the escrows. Assali was never present during any conversation where Burchell suggested using cashier's check to make it appear like borrower was giving the down payment; Co-d, Vol. V, pp. 18-23.

Defendant's counsel was totally ignorant of Assali's March 2015 trial testimony during defendant's January 2016 trial. Had he been aware, he could have called Assali to dispute Burchell's testimony that Assali pressured her to commit fraud for Khatib's company; Co-d, Vol. V, pp. 71, 79. Not only would Assali's testimony impeach Burchell it would also impeach Khatib the two most significant

---

[4] Vol. V, refers to Day 8, Vol. II of the 3/20/15 Co-defendant trial proceedings followed by the relevant page number.

witnesses against defendant.

**Lorraine Thibodeau:**

Thibodeau was an escrow officer for Escrow Quick in 2007. She provided escrow services for Khatib's company. She had a falling out and stopped doing escrow for Khatib's company because she requested a valid receipt before releasing funds. Khatib got frustrated and angry and took his business elsewhere when Thibodeaux wouldn't do what Khatib wanted; Co-d, Vol. V, pp. 28-30.

Because defense counsel never obtained the transcripts of her March 2015 trial testimony. He was ignorant about Thibodeau's testimony impeaching Khatib. The most important witness against defendant.

**Nariman Khatib**:

Khatib's wife testified that she agreed to buy some condominiums because Khatib told her it was a good investment and that she didn't have to make any down payment. All Khatib told her was that she was going to get cash back from the builders after she made the purchases. Khatib told her that there was nothing wrong with the investment. She relied on Khatib's advice when she bought the condominiums. She had no idea when she signed closing documents that they contained any false information; Co-d, Vol. V, pp. 44-50.

Any marginally competent defense attorney armed with this March 2015 transcript would have had a field day with this lady. Whether she was the gullible loving wife who innocently believed everything her crooked husband said or whether she is the cunning spouse corruptly covering up her husband's ill gotten gains, the benefit to any defense counsel of her March 2015 trial testimony would have been immeasurable. Especially since she was the beneficiary of millions of dollars going out and in the U. S. and part of the family business where Khatib concealed millions of dollars after returning to U.S. Counsels failure to get or use the transcript is

9

1 stunning and could never be written off as a tactical decision.

### III.
### BECAUSE COUNSEL WAS IGNORANT OF THE CONTENTS OF BURCHELL'S MARCH 2015 TRIAL TESTIMONY HE RENDERED INEFFECTIVE CROSS-EXAMINATION OF BURCHELL IN JANUARY 2016 TRIAL

Counsel was ignorant of Burchell's testimony that she didn't have any dealing with defendant and didn't want to have any dealing with defendant having her work at Excel.

Counsel's cross-examination was limited to violating the law by submitting fraudulent HUDS, a civil suit for fraud at Excel, and committing fraud of Point Break, her relationship with Khatib and defendant's brother, and her plea to one count of bank and wire fraud that covered her work at both Excel and Point Break and some e-mails supporting her fraud and her work for the FBI, and her motivation to get a more lenient sentence; Co-d, Vol. VI[5], pp, 49-92.

Had Counsel obtained the readily available transcripts of Burchell's March 2015 trial testimony he would have conducted a far more effective cross examination of Burchell.

Burchell testified she met Khatib in his Tustin office while he was working at Escrow Quick. She also met Maher Obaji; Co-d, Vol. VI, pp. 48-50. They talked about a new business venture; Co-d, Vol. VI, p. 51. The business was Excel; Co-d, Vol. VI, p. 52. Several weeks later, Burchell had a meeting with Assali Khatib and Maher about doing escrows and how Excel was going to be paying the down payment for properties which was unusual. Burchell advised them to use cashier's check so that it would appear that the down payment came from the buyer. She understood

---

[5] Vol. VI, refers to Day 5, 3/17/15 of Co-defendants trial proceedings followed by the relevant page number.

1  concealing the source of the down payment was fraud but chose to do it because of
2  pressure from Assali; Co-d, Vol. VI, pp. 53-55. In the summer of 2008 she started
3  working for Excel for little over a year. She regularly reported to Maher Obaji; Co-d,
4  Vol. VI, pp. 56-58. Maher Obaji told her not to put the commission or any of the
5  closing statement; Co-d, Vol. VI, p. 59. Burchell saw defendant loan processing; Co-
6  d, Vol. VI, p. 64. Burchell saw people reporting to Maher who gave them instruction;
7  Co-d, Vol. VI, pp. 69-70. Burchell was instructed by Maher Obaji to omit large
8  marketing fees; Co-d, Vol. VI, p. 77. Maher supervised her and each of her escrow
9  closings; Co-d, Vol. VI, p. 81. Maher would review the document to ensure the
10 marketing fees were not on the HUD; Co-d, Vol. VI, pp. 82-83.

11      Burchell signed a plea agreement admitting to helping Excel commit mortgage
12 fraud and also admitting to committing real estate fraud that was separate from the
13 Exel fraud; Co-d, Vol. VI, p. 94. She made $70,000 from this separate fraud scheme;
14 Co-d, Vol. VI, p. 95. She talked to the FBI because they came knocking and she was
15 very scared. She agreed to talk because she was afraid and she wanted to help to start
16 making things right. She was named in 15-20 law suits related to her fraud. During
17 her deposition she was not truthful because she was scared and she believed she
18 would be financially liable for the outcome; Co-d, Vol. VI, pp. 96-102. She never lied
19 to the FBI. She lied in her deposition because it was a civil case, she was scared and
20 she didn't realize that it was the same matter of importance to be completely truthful;
21 Co-d, Vol. VI, p. 102.

22      Burchell routinely went over files with defendant and Maher; Co-d, Vol. VI, p.
23 113. Saving the During the summer of 2009. Maher Obaji told her to pack up her
24 belongings because they were moving and she needed to go back to Escrow Quick;
25 Co-d, Vol. VI, p. 156. After Excel, Burchell worked for Point Break Escrow. After
26 her employment of Point Break, she interviewed with the FBI because she was
27 scared, didn't want to continue to commit fraud, and she wanted to tell or give her
28 complete honesty to the Government; Co-d, Vol. VI, p. 157.

Burchell worked at Point Break after Excel for 10 months and she participated in fraud involving short sale letters; Co-d, Vol. VI, pp. 163-164. Maher wasn't directing her fraud at Point Break. She did the fraud on her own; Co-d, Vol. VI, p. 165. Her plea deal was based on her cooperation; Co-d, Vol. VI, p. 167. She was hoping to keep her escrow license and hoping she wouldn't be prosecuted; Co-d, Vol. VI, p. 168. She told the FBI she never sent a fake receipt to any bank and she blamed everything on Maher; Co-d, Vol. VI, p. 170. Khatib had made other requests to circumvent the system before Burchell started doing the fraudulent escrow for him; Co-d, Vol. VI, p. 177. It was Burchell's idea to use cashier's checks to facilitate the fraud; Co-d, Vol. VI, p. 180.

Burchell had her recollection refreshed that she told the FBI that defendant was older than Maher and would direct him; Co-d, Vol. VI, p. 183. Burchell did not have any dealings with defendant and didn't want to have any dealings with defendant; Co-d, Vol. VI, pp. 184-185.

Burchell admitted to hoping to avoid any criminal responsibility and to keep her escrow license but denied lying to protect herself; Co-d, Vol. VI, p. 196. She didn't want to pay money in her current case and didn't want to reimburse the bank; Co-d, Vol. VI, pp. 196-197. She had conversation with Khatib a few weeks before her civil deposition in which she perjured herself; Co-d, Vol. VI, p. 197. Burchell told Khatib that she knew she was going to be charged. She also knew that if she admitted to fraud she would have to pay money. That's why she lied; Co-d, Vol. VI, pp. 201-202. Her case settled and she never paid any money; Co-d, Vol. VI, p. 203. Burchell was not uncomfortable doing that; Co-d, Vol. VI, p. 205. Burchell began creating the two HUD-forms; Co-d, Vol. VI, p. 209. Burchell would submit the estimated HUD-1 to the bank; Co-d, Vol. VI, p. 210. The banks trusted Burchell to come forward with the final HUD-1 before funding; Co-d, Vol. VI, p. 210. The banks entrusted Burchell not to lie and deceive them during the escrow and she wasn't doing that; Co-d, Vol. VI, p. 211. She was told not to disclose the addendum to the lenders by Maher Obaji;

Co-d, Vol. VI, p. 215. Burchell was told by Lorraine Thibodeau that Khatib was doing illegal and unsavory things, but she still agreed to work for Khatib; Co-d, Vol. VI, p. 218.

## IV
### COUNSEL'S FAILURE TO CALL ATTORNEY WINSTEN TO IMPEACH AGENT CAMPBELL'S TESTIMONY ABOUT DEFENDANT'S KNOWLEDGE AND THE FAKE W-2'S AND 1099'S CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL

According to Agent Matthew's defendant was questioned during his second interview about false income and loan documents. According to Agent Matthew's defendant said Tbakhi and Khatib told him that if the borrower couldn't qualify that he could add inflated rental income to the loan application and that information was not verified by the lender. Defendant told Matthews that he personally added inflated rental income to some clients. Defendant learned after the fact that Tbakhi and Khatib put fake W-2's and pay stubs into clients files; V$^6$, 35-36.

According to Matthews, Defendant became aware of the fake W-2's and pay stubs after the deal closed and defendant continued to work at Excel after learning about the fake documents; V, 36.

Mike Winsten, defendant's attorney was present during this interview and disputes Matthews testimony about defendant's knowledge about the fake documents and defendant's action of adding inflated rental income to some of defendant's clients. Specifically, attorney Winsten made contemporaneous notes and has those notes available and was prepared to testify if called that he has clear recollection that defendant had no knowledge and participation in the fake W-2's and 1099's until well after the fact and when he learned about these facts he stopped being an agent and worked as a receptionist to distance himself from their potential shenanigans.

---

[6] As previously mentioned, Vol. V, refers to Day 5 of defendant's jury trial followed by the relevant page number.

Defense counsel could not possibly have any reason for not putting Winsten on to impeach the exculpatory testimony of Agent Matthews. Counsel was ineffective in this failure to do what any marginally competent defense attorney would have done.

## CONCLUSION

Individually and collectively defense counsels errors and omissions were so inadequate that it obviously denied the defendant his Sixth Amendment right to counsel, See e.g. *U.S. v. McKenna,* 327 F.3d 830, 845 (9th Cir. 2003) (Claims of ineffective assistance of counsel are generally inappropriate on direct appeal unless (1) the record on appeal is sufficiently developed to permit review and determination of the issue, or (2) the legal representation is so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel). Here counsel is timely developing the record for appeal showing that defendant's legal representation was so inadequate that it obviously denied defendant his Sixth Amendment right to counsel.

Dated: 12/29/17                                          Respectfully Submitted,

                                                         /S/
                                                         Robinson D. Harley, Jr.
                                                         Attorney for Defendant