# EXHIBIT A



October 9, 2021

Robison D. Harley, Jr.
825 N. Ross Street
Santa Ana, CA 92701

In re:          US v. Momoud Aref Abaji

Dear Mr. Harley:

This declaration is being submitted in response to your request to conduct a forensic accounting of the government's initial victim loss calculation of $10,047,272 as detailed in the June 2016 Probation Sentencing Report (PSR). However, Upon remand by the 9th Circuit Court of Appeals, the 6th Amended PSR dated 9/18/2018 calculated a new loss amount of at least $12,003,528. Please be advised that I continue to review the government's financial loss evidence which could result in an amended declaration prior to the sentencing date. Unless otherwise stated, the information in this report is based upon information and belief and is based upon my personal knowledge of the discovery as listed below and if called upon to testify; I could and would competently testify thereto.

## QUALIFICATIONS AND BACKGROUND

Exhibit "1" attached hereto is a true and correct copy of my Curriculum Vitae and accurately sets forth my qualifications and background.

1.      I am the owner of Knudson and Associates (Knudson Investigations) and have been since November 2000.  I am a consultant within the area of forensic accounting and fraud investigations.   My clients include, among others, non-profit

Declaration of Carl R. Knudson
October 9, 2021

organizations, insurance companies, retail stores, electronic manufacturers, real estate companies, golf courses, construction companies, banks, corporations, the Federal Public Defenders' Office in Los Angeles and Orange County, and the Orange County Public Defender's Office.  I consult, and sometimes conduct investigations for my clients on issues regarding the alleged laundering of monies, and purported embezzlement and laundering of the proceeds by corporate officers and employees.  I have consulted for the Federal Public Defenders Office in Los Angeles and Orange County, California in tax fraud cases and mail fraud, wire fraud, embezzlement schemes (sometimes known as Ponzi Schemes).  I have also consulted with CJA Panel attorneys, in their defense of clients accused of complex financial crimes such as tax fraud, Medicare Fraud, bankruptcy fraud, mail fraud, money laundering, identity theft and wire fraud and have testified as an expert in Federal and State court proceedings regarding my findings and opinions.

2.      Since I began Knudson and Associates in November 2000, I have also been engaged as an expert witness in connection with federal and state court proceedings in approximately 100 cases.   I have testified as an expert witness at trial in eleven cases.  My expert witness engagements have been in the following areas:  Medicare fraud, tax fraud, federal and state money laundering schemes, federal money structuring schemes, wire fraud schemes, mail fraud schemes, bankruptcy fraud schemes, SEC violations, bank fraud schemes, loan fraud schemes, mortgage banking fraud, narcotics trafficking, Ponzi schemes, Pyramid schemes, Telemarketing schemes, Identity Theft schemes, Political Corruption schemes, and embezzlement schemes.

3.      Prior to becoming a consultant, from June 1997 to October 2000, I was employed as a director in the Financial Advisory Service practices at the Big 5 accounting firms of Price WaterhouseCoopers and KPMG.  As a director, I

Declaration of Carl R. Knudson
October 9, 2021

managed and conducted engagements into internal embezzlement schemes by corporate officers employed at high tech companies, construction companies, insurance companies, hotel management companies, hospitals, HMO's, not-for-profit organizations, city government and casinos.  I coordinated investigative and forensic accounting efforts with external counsel, general counsel, human resources and the internal accounting staff. I traced flow of embezzled funds through corporate books and records, bank accounts and internal backup documents.   As a director, I also consulted with national banking institutions regarding purported money laundering schemes that had occurred at their bank(s) and suspected malfeasance by a bank officer.

4.      From May 1973 to June 1997, I was employed as a special agent with the IRS, Criminal Investigation Division ("CID").  As a special agent, I conducted numerous investigations into real estate fraud, FHA/VA loan fraud, money structuring and money laundering cases relative to narcotic traffickers and organized crime subjects.  I worked with banking institution and local regulators in providing guidance into the implementation of money structuring (USC, Title 31) and money laundering laws (USC, Title 18, section 1956) and related banking regulations.   I also worked closely with local banking institutions while conducting joint investigations with the Federal Bureau of Investigations (FBI) during the Savings and Loan crisis in the 1980's and FHA/VA loan fraud schemes in the late 1970's and early 1980's

5.      In connection with my employment with the organizations described in the preceding two paragraphs, I received extensive training on auditing, accounting, and financial investigative techniques.   In those positions, I participated in, and conducted, hundreds of investigations of alleged criminal offenses, including tax crimes, money laundering, structuring, wire fraud, mail fraud, health care fraud,

Declaration of Carl R. Knudson
October 9, 2021

bankruptcy fraud, Ponzi schemes, real estate fraud, pyramid schemes, loan/bank fraud, embezzlement, and other fraud related offenses.

**6.**　　As a result of my experience and training as shown above in paragraphs 2 through 4, I have become familiar with conducting the financial analysis of a business operation, and the financial analysis of a person's wealth and net worth. As a result of my experience, employment, and training, I have become aware of how a business operates, generates revenue and pays its operating expenses. As a result of my employment, I have reviewed financial records, real estate records and bank documents showing the financial status of individuals or companies.  I have also analyzed tax returns and tax return information in order to reconstruct the financial viability of individuals and companies.

7.　　I have a Bachelor of Science degree in business administration.  I am a licensed private investigator in the State of California and a Certified Fraud Examiner (CFE).

### **DOCUMENTS REVIEWED**

8.　　I have received and reviewed the following documents:

Government Trial Memo 1/14/2016 Momoud Aref Abaji

Probation Sentencing Report dated 4/18/2016 re Momoud Aref Abagi

Probation Sentencing Report dated 7/12/2016 re Momoud Aref Abagi

Probation Sentencing Report dated 6/7/2018 4th Amendment re Momoud Aref Abagi

Declaration dated 5/14/2018 of Special Agent Campbell, FBI with Exhibits/Schedules and victim loss supporting documentation (356 pages) re $10M loss calculation.

　　Probation Sentencing Report dated 6/17/2018 re Momoud Aref Abagi
　　Probation Sentencing Report dated 7/3/2018 re Momoud Aref Abagi
　　Probation Sentencing Report dated 9/28/2020 re Momoud Aref Abagi
　　Probation Sentencing Report dated 9/28/2020 6th Amendment

4

Declaration of Carl R. Knudson
October 9, 2021

Probation Sentencing Report dated 5/10/2021 re Momoud Aref Abagi
Sentencing transcript re Jacquelin Burchell 4/30/2019
Sentencing transcript re Ali Mustafa Khatib 6/24/2019
Trial Transcript Momoud Aref Abagi, Campbell Testimony
Trial Transcript Maher Obagi, Campbell Testimony
Interview of Janice Armstrong dated 12/13/2011
Discovery #28 re Alternative Loss Calculation 109 Properties, $12M (60 pages) 2018. (not attached as exhibit due to volume)

## **INTRODUCTION**

9.     The government's trial brief (Exhibit 1) stated; "From approximately 2007 until 2009, defendants ABAJI, OBAGI and SALAH, along with other co-conspirators, *participated* in a "builder-bailout" mortgage fraud scheme. Other participants included co-defendants Ali Khatib, Wajieh Tbakhi, and Jacqueline Burchell (defendants Khatib and Burchell are now cooperating. The defendants committed the scheme by identifying developers around the country struggling to sell units in large condominium developments and willing to pay large cash incentives' in exchange for the sale of multiple units in the development."

10.     The government concludes; "In this way, the defendants purchased, or caused to be purchased, more than 100 properties around the country, and caused significant losses to the lenders when straw buyers defaulted on the loans.  The defendants employed this scheme from late 2007 until late 2009, and the mortgage lenders that they affected lost a total of approximately $6.2 million on loans that they would otherwise not have funded."

11.     The government also stated in their trial brief (1/14/2016) that; "Defendant and the other organizers knew that condominium developers across the country held large amounts of unsold inventory in developments that had been planned and constructed before the housing market began to contract in 2007, and they knew

Declaration of Carl R. Knudson
October 9, 2021

that the developers were highly motivated to sell overpriced units in their inventory at inflated list prices so as to prevent a sudden drop in those homes' prices and the prices of the remaining units in the developments. The co-conspirators were also aware that many of these developers would be willing to pay large cash incentives (i.e., kickbacks) in exchange for being able to sell their units at artificially inflated prices**.** Defendant, Khatib, and Tbakhi thus sought to locate such sellers and negotiate discounts on prices."

      a.      I have reviewed numerous interviews of the builder/developers (and their attorneys) of the affected Condominium Projects at issue in government's investigation that discussed the issues of whether the marketing fee was "legal" or whether the lenders on the condominiums would refuse to provide loans where "fees" were paid to the borrower.

      b.      However, there is no evidence that Mr. Abaji acted as a straw buyer or purchased any of the 104 properties in question.

12.    In a discovery letter dated January 25, 2013, The AUSA advised defendants that the FHFA had filed civil lawsuits against 18 financial institutions alleging that lenders had failed to follow their underwriting guidelines causing <u>losses</u> to FHFA conservatees Fannie Mae and Freddie Mac but the AUSA stated that the civil litigation was not material to the criminal case.

13.    Further, **the FHFA website published a News Release dated 9/2/2011** stating that the FHFA, as conservator for Fannie Mae and Freddie Mac (the Enterprises), today filed lawsuits against 17 financial institutions…" "The suits allege violations of federal securities laws and common law in the sale of residential private-label *mortgage-backed securities* (PLS) to the Enterprise.

14.    It was widely reported that the **September 2008 Bailout** by the government gave funds to Freddie Mac and Fannie Mae for their Mortgage-Backed Securities

Declaration of Carl R. Knudson
October 9, 2021

---

(MBS), and many of the Lenders in the Abaji case were reported to receiving

bailout monies as well.

15.    Research on the contraction of the 2007 housing market was summed up in a

recent online article published by Wikpedia:

> "The **financial crisis of 2007–2008**, also known as the **global financial crisis** (**GFC**), was a severe worldwide economic crisis. Prior to the COVID-19 recession in 2020, it was considered by many economists to have been the most serious financial crisis since the Great Depression. Predatory lending targeting low-income homebuyers,[1] excessive risk-taking by global financial institutions,[2] and the bursting of the United States housing bubble culminated in a "perfect storm". Mortgage-backed securities (MBS) tied to American real estate, as well as a vast web of derivatives linked to those MBS, collapsed in value. Financial institutions worldwide suffered severe damage,[3] reaching a climax with the bankruptcy of Lehman Brothers on September 15, 2008 and a subsequent international banking crisis.[4]
>
> The preconditions for the financial crisis were complex and multi-causal.[5][6][7] Almost two decades prior, the U.S. Congress had passed legislation encouraging financing for affordable housing.[8] In 1999, the Glass-Steagall legislation was repealed, permitting financial institutions to cross-pollinate their commercial (risk-averse) and proprietary trading (risk-seeking) operations.[9] Arguably the largest contributor to the conditions necessary for financial collapse was the rapid development in predatory financial products which targeted low-income, low-information homebuyers who largely belonged to racial minorities.[10] This market development went unattended by regulators and thus caught the U.S. government by surprise.[11]
>
> After the onset of the crisis, governments deployed massive bail-outs of financial institutions and other palliative monetary and fiscal policies to prevent a collapse of the global financial system.."

16.    The Probation Sentencing Report (Exhibit 2) dated 4/18/2016, stated:

*"Losses*

58. **Abaji** and his co-conspirators executed this scheme to purchase at least 76 properties that **resulted** in a loss to the lender, using false and fraudulent statements to induce the victim lenders to fund the transactions. The 12 lenders and secondary purchasers suffered losses of at least **$10,047,272** as a result of delinquencies, defaults, and foreclosures on these properties. This loss amount includes any credits and payments made toward the loan principal on the properties and any recovery of the collateral."

## ANALYSIS

## The 10 Million Loss

17.    The $10 million loss calculation was compiled by FBI Agent Heather

Campbell (Exhibit 3) who included a number of exhibits that suggests a "loss"

Declaration of Carl R. Knudson
October 9, 2021

calculation for each of the 76 properties that were part of the $10 million dollar loss. Campbell explained in her declaration that during the period soon after the trial (2015) and up to the date of her declaration (May 2018), she contacted the apparent victims of the loan fraud and could only obtain loss figures for a total of 76 properties divided between 12 (twelve) victim lenders.

18.    Campbell's 5/14/18 declaration summary at Exhibit 7, specifically identifies losses to:

   (1) HSBC Bank NA suffered a loss of $1,244,473 for loans associated with 12 properties.

   (2) Wells Fargo Bank NA suffered a loss of $2,077,564 for loans associated with 14 properties.

   (3) Bank of America NA suffered a loss of $2,020,526 for loans associated with 21 properties.

   (4) Ditech/GMAC suffered a loss of $477,034 for loans associated with three properties;

   (5) Freddie Mac suffered a loss of $600,307 for loans associated with five properties.

   (6) Fannie Mae suffered a loss of $760,066 for loans associated with five properties;

   (7) Guaranty Bank suffered a loss of $249,571 for loans associated with two properties;

   (8) JPMorgan Chase Bank NA suffered a loss of $502,395 for loans associated with three properties;

   (9) CitiMortgage, Inc. suffered a loss of 1,381,813 for loans associated with eight properties.

Declaration of Carl R. Knudson
October 9, 2021

(10) Mortgage America, Inc. Suffered a loss of $385,121 for loans
associated with two properties.

(11) Liberty Savings Bank suffered a loss of $186,920 for the loan
associated with one property, and

(12) Fifth Street Mortgage suffered a loss of $161,482 for the loan
associated with one property.

19.     Campbell's declaration included Schedule A, a spreadsheet where she
displayed information that she believed documented the $10M loss and was
summarized in 7 pages that provided: Address, Unit #, Buyer/Borrower, Lender,
Loan #, Victim Institution, Loss Amount, Page In Support Documents Package,
Line Item on Trial Exhibit A, Line Item on Trial Exhibit 15.

        a.      Thereafter, the Campbell declaration provides the basis (foundation)
for the victim loss calculation by victim institution 1 (one) through 12 (twelve)
(starting at page 75 of 321 of the PDF document).  The pdf documents included
correspondence and copies of spreadsheets that were received from alleged victims
and identified as victims #1 through #12.  Many of the victim documents were so
scrambled that it was virtually impossible to follow, and there were schedules that
had been so redacted that they were useless to anyone trying to verify their
authenticity.

        b.      However, the actual specific detail related to the "loss" amount was
not shown in Schedule A, rather the specific detail was clarified in the supporting
documentation which revealed that a "make whole" provision constituted a
substantial amount of the Schedule A loss amount associated with the 12 listed
victims.  Further, the underlying detail shows that some of the properties were
"repurchased," were retained by the lender or the loss was a "book loss", but those

Declaration of Carl R. Knudson
October 9, 2021

details or an explanation were excluded from Campbell's declaration and Schedule A.

      c.    Agent Campbell does not cite a verifiable authority who could explain why the "make whole" provision constitutes a loss to the lender/victim when according to the government the lender received the property (collateral) back from Fannie/Freddie.

      d.    Finally, Campbell's declaration provides no evidence on when the victim loans were purchased by Fannie/Freddie or how much was paid to the victim lender at that time.  We know that at some point Fannie/Freddie demanded to be "made whole" which is only one-half of the transaction and in my opinion is therefore merely an offset against what Fannie/Freddie originally paid for the victim loan.

20.    Campbell's declaration (known as Schedule C) listed **Victim #1, HSBC (Exhibit 3, PDF p.78).**

In a FAX to Heather Campbell dated April 20,2015 from Kathy Press re HSBC Losses, "Hi Heather, please see the following spreadsheets..." Exhibit 3, page 76-77, Campbell declaration), which contained two heavily redacted pages of alleged losses calculated by HSBC on identified properties and loan numbers, including date of loan and date of disposition of the specific loan by categories: Make Whole Amount, Charge off, Write downs and a "total loss amount."  On the HSBC schedules on the right-hand side of the schedule were handwritten notes references what I interpreted to be references to loss numbers shown on Schedules A and B which were written by FBI Agent Campbell.

      a.    The total loss amount appearing on the HSBC schedules was $1,322,426.69 with $902,746.11 attributed to "Make Whole," $310,137.67 as

Declaration of Carl R. Knudson
October 9, 2021

"Charge Off" and $32,395.01 as "Write downs."  The total number differs from the HSBC loss as listed on the government's sentencing memorandum 4/15/18 at page 6 that lists a $1,244,473.00 HSBC loss amount. Also provided on the HSBC Fax was a column labeled "Investor/Current Owner" that revealed that FNMA currently owned some of the loans or that HSBC had Repurchased some of the loan (from whom we don't know).  This very relevant detail did not appear on Campbell's Schedule A and there is no mention of this issue in Campbell's declaration.  The victim losses are all lumped together so the intended consumer of this victim's loss would never know to question the underlying loss explanation by the victim.

b.     I noted that the Probation Officer reported that Victim Impact letters had been sent to the victims, but there was no response.

21.     I have constructed a Summary Schedule of the HSBC loans (Exhibit 2, attached hereto) as referenced above where I have reconciled the HSBC loss numbers to the Campbell declaration at Schedule A (attached to this declaration). My Summary Schedule shows that HSBC provided information on 19 loans listed by address, approximate settlement date, loan number and loan amount.  Further, HSBC provided a column that identified the Investor/Current Owner (as of 2015) that revealed that HSBC had repurchased 7 (seven) properties that they were now claiming a $328,536.96

loss on four of the seven properties with the other 3 properties either current or being evaluated.  I have noted that Campbell did not discuss that three of the HSBC loans were current or that HSBC had repurchased 7 of the listed properties.

22.     Of the 19 HSBC listed properties, there were 6 properties that were listed as currently owned by FNMA as of the 2018 Campbell declaration, but HSBC

Declaration of Carl R. Knudson
October 9, 2021

claimed a $754,600.57 "Loss" attributable to the "Make Whole" provision by FNMA. According to the government's sentencing declaration, ".Fannie Mae and Freddie Mac, purchased the full unpaid principal balance of the relevant loans immediately after they were issued, making the loss calculation the same for both" (p14). However, Campbell's declaration does not provide the details on the initial sale transaction between HSBC and Fannie/Freddie or (assuming the loan was sold to FNMA) when the loan was returned to HSBC. Further, there is no discussion by Agent Campbell that the loan collateral (property) was not recovered from Fannie/Freddie by the "victim" lender.

a.     The value of the property was established through the "unpaid balance" when sold to FNMA and that same value was apparently used to "make whole" or return the collateral to the lender. However, there is no detail from HSBC showing when FNMA received the loan, nor the date when FNMA returned the loan to be "made whole." So, it is impossible to calculate a loss when the sale of the loan to FNMA is not shown and the date of the "make whole" demand by FNMA.

b.     I inserted data from Government's Schedule F (Alternative Calculation) in order to compare it to the data shown on Government's Schedule A. It is noted that Schedule A was a summary of the government's $10M loss calculation for sentencing purposes and Schedule F was an apparent summary of the government's $12M loss calculation after the remand from the 9th Circuit. Schedule A and Schedule F are based upon different sets of data. Schedule A is based on data provided by the 12 victim banks on 76 properties and interpreted by Agent Campbell. Schedule F is based upon the FBI research on their Real Estate database which references a "parcel number" and provides a date of foreclosure, a

Declaration of Carl R. Knudson
October 9, 2021

resell date and a resell amount on 109 properties.  It appears that the government
calculated the "loss amount."

c.      Neither Schedule A nor Schedule F provide the number of mortgage
payments that were made prior to foreclosure which would be critical in providing
a reliable loss calculation for either schedule.  As shown in my summary
schedules, there were many properties that were held for more than 3 years before
it was foreclosed upon and resold.  As further explain in my declaration at "Profit
Calculations," the government's analysis of the bank accounts of the defendants
showed that substantial payments were being made to the victim mortgage
companies, which were not credited (subtracted) from the government's loss
calculation.

23.   **Victim #2, Wells Fargo Bank (WFB) Loss (as of 5/14/2018)**

Campbell's Schedule A lists 14 properties alleging losses of $2,077,564.  In a **May
8, 2016** email from Wells Fargo to "Heather," re FBI Mortgage Loan Losses,
"..please find the Wells Fargo mortgage loan losses on those loans you requested."
On the following page WFB states:

"The following Wells Fargo Bank mortgage loans were sold to outside
investors, either the Federal Home Loan Mortgage Corporation (FHLMC),
also known as Freddie Mac, or the Federal National Mortgage Association
(FNMA), also known as Fannie Mae and subsequently underlined_repurchased by Wells
Fargo after payment default.  The dollar amounts associated with each loan
represents a "make whole" payment to the investor at the time of repurchase
and represents a **loss exposure** to Wells."

Declaration of Carl R. Knudson
October 9, 2021

a.      However, the victim's loss number on government's Schedule A for Wells Fargo only included a gross loss number and did not provide the detail as provided by Wells Fargo in the 2016 email and attached spreadsheets.

b.      I have prepared a summary spreadsheet (Exhibit 3, attached hereto) listing the loan-loss information that Wells Fargo provided to the FBI which were categorized by; Make Whole, Foreclosure Sale or a Short Sale and Reflected Limited Losses At This Time.

c.      The redacted WFB documents (assuming FBI **did no**t contain any data as to when the loan was initially granted by WFB, when the loan was sold to Fannie/Freddie, the price paid to WFB for the sale or when the loan was returned to WFB by Fannie or Freddie.  There is no information provided by WFB on whether mortgage payments were received on the properties prior to foreclosure which would be offsets against a loss calculation.  There was no information from WFB indicating whether the "loan servicing" was part of the sale to Fannie/Freddie.

d.      Although WFB provided information on 24 loans, only 14 (Schedule A, rows 60-73) were listed on government's Schedule A loss to WFB.  I listed all of the WFB data on my spreadsheet which showed that WFB listed 5 properties with "Limited Losses" as of the **2016 WFB** email.  There were 5 properties categorized as "Foreclosure Sale or a Short Sale" that were not listed on Campbell's Schedule A with no explanation in Campbell's declaration.  Therefore, of the 14 WFB loans per my analysis $1,575,550.06 were attributed to "Make Whole" and $502,018.00 were attributed to "Foreclosure Sale or a Short Sale."  It should be noted that the WFB term "loss exposure" was never verified by Campbell as to when the "actual" loss might have occurred.

Declaration of Carl R. Knudson
October 9, 2021

e.      Campbell's declaration included Schedule F (Alternative Calculation) based on Foreclosure & Short Sales Date.  Schedule F included the property address, Unit, Approximate Settlement Date, Buyers Initials, Loan Amount, Lender, Loan #, Approximate Foreclosure Date, Approximate Resell Date, Approximate Resell Amount, Loan Amount/Less Resell Amount and Parcel #. Further discussion of Schedule F is found at page .. of my declaration relative to the $12 million dollar loss analysis.

f.      It is my understanding that Schedule F was compiled from an FBI database that reference a property address and parcel number.  There was no explanation in Campbell's declaration as to how the FBI data is reliable and actually reflects all of the recorded events that would be recorded by a County Recorder in the applicable jurisdiction.

24.    In my summary spreadsheet of the WFB loan data I added an "amount" column since government's Schedule A did not include that data and, I added an additional column(s) that listed the data in government's Schedule F.  The purpose of adding the Schedule F was to compare this data to the data in Schedule A to verify if the Foreclosure and Short Sales date and amounts were consistent with the victim's statements to the FBI related to Short Sales and Foreclosures.

a.      Schedule F did not record any data on when the WFB loan was sold/conveyed to Fannie/Freddie or when the loan was reconveyed back to WFB pursuant to the "Make Whole" demand by Freddie/Fannie.

b.      Schedule F showed that, with respect to the 9 properties associated with the "Make Whole" loss claim by WFB in their email dated **May 8, 2015**, email i.e "Loss Exposure" (Schedule A, A60 and A62 to A70), all of the properties had been foreclosed and sold during the period **2009 to 2011**.  Schedule F does not

Declaration of Carl R. Knudson
October 9, 2021

provide the identity of the person or persons who purchased the properties in 2009
to 2011.  WFB in their **May 8, 2015** email does not disclose that the loans (A-60 to
A-70) in question had already been sold (confirmed by Campbell's Schedule F
data).  Further, Campbell's 2018 declaration does not explain how WFB could
claim a "Make Whole" loss in 2015 when Campbell's Schedule F showed that the
properties had been sold during the period 2009 to 2011.  Thus, the WFB loss
claim of $1,575,550.06 seems to be in serious doubt based upon the government's
own analysis in Schedule F.

     c.     WFB provided a loss claim of 1,212,323.65 on "Foreclosure Sale or
Short Sale Loss" on 9 (nine) properties in their May 2015 email to Agent
Campbell.  However, Schedule A only includes properties A-61 and A-71 to A-73

for a loss total of $502,018.00.  The WFB email does not provide a date of sale or
the identity of the person acquiring the property; whether WFB repurchased the
property is an unanswered question.

25.    **Victim #3, Bank of America (Declaration p.89-99 As of 5/14/2018.)**

Schedule A, attached to Campbell declaration summarizes 21 properties with a
total loss of $2,020,526.00.  Campbell's declaration then references an email
received from Bank of America dated June 3, 2015 re "Corrected" list for Loan
Loss Request with attached declaration of Victim/Financial Losses (p91 pdf).  The
total loss listed by BANA was $2,571,737.13 with attached spreadsheet schedules
(pdf 93—98) with the last two pages (97-98) containing handwritten references to
line items on Schedule A.  I have attributed the handwritten notations to FBI agent
Campbell.  I noted that the Bank of America spreadsheets were heavily redacted
and cut into pieces, so it is impossible to assure that the pieces of spreadsheets are
what Bank of America (BOA) provided to the government.  Further, the

Declaration of Carl R. Knudson
October 9, 2021

documents are not consistently presented in one view without rotating the PDF pages.

    a.  Page 97 contains a "Notes" section that provides an explanation of the "losses" per line item in <u>three</u> main categories:

"BANA P&I losses combined with Fees Due bookloss."
"FHLMC mak(sp)whole combined with Fees Due bookloss." and
"FHLMC investor market loan combined with Fees Due activity."

    There is no explanation in the BOA email explaining what the above referenced terms mean as far as "actual" loss as per the sentencing guidelines. Further, I am aware that the terms "P & L" (Profit & Loss), or "book loss" are accounting terms that go far beyond an "actual loss" calculation. The "mak(e) whole" number is combined with Fees bookloss and there is no specific number attributed to the "make whole" amount. Further, there is no discernable data on the BANA spreadsheets showing a date of when FNMA purchased the loans, a date of foreclosure or the date when the loss occurred. Vital information in determining a loss or corroborating the victim statement is not provided by BANA.

    b.    There is no explanation by BANA as to why the "make whole" number is a loss since they apparently had to take the "loan" back from FHLMC. BOA did not provide any information on when the "loan" was sold to FHLMC (Fannie/Freddie), the sales price, the date of sale, whether the loan servicing was part of the sale and the date when the "loan" was returned. There is no explanation by BOA or the government explaining how a loss occurs when the "loan" is returned to the original lender.

    c.    As in the previous victims #1 and #2, government's Schedule A only provided gross numbers of the loss with no detail as to the nature of the loss which had been specified by Bank of America in their 2015 email referenced above.

Declaration of Carl R. Knudson
October 9, 2021

26.    I have constructed a spreadsheet (Exhibit 4, attached hereto) that lists the Schedule A properties that tracks the loss numbers attributed to the particular property.  I noted that there were several properties listed as Country Wide Funding, and I am aware that that BANA purchased Country-Wide Funding and their real estate portfolio.

a.    As in the previous two victims, I constructed a spreadsheet that listed the Schedule A spreadsheet that listed loss numbers to a particular property address, unit number, settlement date, initials of borrower, loan number and loss amount.  Schedule A did not include a loan amount or specific detail as to the nature of loss i.e. Make whole or short sale.  I added a column to my spreadsheet to include a loan amount and "notes" from Bank of America describing the nature of the loss.  Next, I added columns from government's Schedule F to compare dates and events related to the same Schedule A properties and note any differences between the two government schedules.

b.    Even though the listed properties had been sold (settlement date) in 2008 or 2009 (Schedule A), and per Schedule F, the same properties were subsequently foreclosed and resold in 2010 or 2011 (for the most part), the victim bank indicated a "loss" as of their 2015 email to Agent Campbell.  There was one property that was foreclosed on in 2013 and one property where the data was unclear as to a loss according to Schedule F.  There was no detail provided by BANA about when the actual loss occurred or details regarding foreclosure and resell dates.

c.    Losses on properties 6 through 21 listed on Schedule A were attributed to "FHLMC makewhole combined with Fees Due Bookloss" and totaled $1,611,997 with $408,529 attributed to "BANA P&I losses combined with fees

18

Declaration of Carl R. Knudson
October 9, 2021

---

due bookloss."  The loss amounts on Schedule A and Schedule F are similar, but the victim bank explanations attribute $1.6 million to "FHLMC makewhole combined with Fees Due Bookloss" and Schedule F attributes the loss to a foreclosure sale.  The conflicting causes of the losses were not addressed in Campbell's declaration and were not discussed by the 2015 email from BANA.

d.     There was no detail provided for the 2-years of mortgage payments made on the properties prior to foreclosure by the victim bank, nor was there any details regarding the sale of the loans to FHLMC in or about 2008 or 2009.

e.     Note: I continue to analyze the "Victims" #5 to #12 and will update my declaration prior to sentencing.

## **12 Million Loss**

27.     On 9/28/2020, the loss calculation for sentencing was revised with a new loss number of $12,003,528.  The reason for the revised loss calculation was explained in the 9/28/2020 6th Amendment to the PSR (Exhibit 7) as follows.

"In light of the 9th Circuit Court remand, the Government has provided the Probation Officer with a revised loss calculation in accordance with mortgage loss calculations discussed in *Morris*. That calculation is (1) take the **entire value** of the principal of the loan; and (2) subtract any amount recovered or recoverable by the creditor from the sale of the collateral. The Government identified 109 properties associated with the defendant's conduct. The victim lenders suffered losses of at least **$12,003,528** as a result of foreclosures on these properties. Specifically, the total loan amount for the subject properties was $21,586,216, of which $9,582,688 was recovered from the total resale amount. The PSR has been revised to reflect the new guideline loss amount as calculated above."

Declaration of Carl R. Knudson
October 9, 2021

a.     There was no reason cited in the PSR as to why the $10 million loss calculation was abandoned since it was based upon information provided by the victim lenders.  Rather than repair the issue based upon the remand, the government seems to have abandoned completely their $10 million guidelines calculation and have adopted a completely new $12 million guidelines calculation. However, the 9/28/2020 PSR does not cite the foundational document(s) that support the new loss calculation.

b.     The 9/28/2020 PSR expands the property loss number to 109 which ignores Agent Campbell's explanation in her declaration that she could only compile data on 76 victim properties as shown in Schedule A.  However, the new PSR does not provide a schedule of named victim's or an amount related to a specific victim.

c.     FBI agent Campbell in her 5/14/22018 declaration at page 11 provided a "Alternative Calculation/Estimated Losses" and explained, "which is included as a backup for guideline purposes and shows the foreseeability of the actual losses."  Campbell states, "I also prepared schedules, labeled Schedules F and G.. to show estimated loss calculations .."".taking the principal loan amounts and subtracting sales prices on short sales of the **relevant properties** (where properties were sold)."  I noted that Campbell's calculation should be to take the original "sales price" since taking the principal loan amounts would inflate the loss amounts substantially.

d.     The **relevant** properties statement by Campbell is confusing since the previous loss Schedule A included 76 properties, whereas Schedule F included 109 properties.  There was no specific detail on government's Schedule F as to a specific victim loss amount for the "12 Victims" as previously detailed in Campbell's Schedule A.

Declaration of Carl R. Knudson
October 9, 2021

e.     Further, Schedule F is not corroborated by a "victim" statement but is merely an analysis of the FBI's real estate database on parcel numbers associated with the property and without any authentication of the underlying data.

28.    In United States v. Morris, No. 12-50302 (9th Cir. 2014) it reads:

"We adopt the two-step approach first articulated by the Eastern District of Virginia, and subsequently adopted by the Second, Sixth, and Tenth Circuits. In calculating loss in mortgage fraud cases, these Circuits hold that the first step is to calculate the greater of actual or intended loss, where actual loss is the reasonably foreseeable pecuniary harm from the fraud. This amount will almost always be the entire value of the principal of the loan, as it is reasonably foreseeable to an unqualified borrower that the entire amount of a fraudulently obtained loan maybe lost. The second step is to apply the "credits against loss" provision and deduct from the initial measure of loss any amount recovered or recoverable by the creditor from the sale of the collateral. This second calculation is made without any consideration of reasonable foreseeability."

29.    Perhaps the "second step" in Morris is to apply credits against loss provision" which would include mortgage payments, or the sale of the properties to FNMA or the repurchase by victim lenders.

a.     The government's Exhibit F shows a 3-5 year gap between when the loan was funded (settlement date) and when the loan went into foreclosure.  The government does not consider in either Schedule A or Schedule F the 3-5 years of mortgage payments received even though their bank analysis of the defendant's bank accounts showed substantial payments to mortgage companies, HOAs and other related expenses.

30.    The PSR dated 9/28/2020 stated:

"58. **Abaji** and his co-conspirators executed this scheme to purchase at least 109 properties that resulted in a loss to the lenders, using false and fraudulent statements to induce the victim lenders to fund the transactions. The 12 lenders and secondary purchasers suffered losses of at least **$12,003,528** as a result of foreclosures on these

Declaration of Carl R. Knudson
October 9, 2021

properties. Specifically, the total principal loan amount for the subject properties was $21,586,216, of which $9,582,688 was recovered from the total resale amount."

      a.      This statement is overly broad and without context since many of the 104 properties did not go into foreclosure, many of the properties were repurchased by the victim and many properties were retained by the victim.

      b.      The total principal value of the loan amount $21,586,216 is exaggerated since many loans as shown on Schedule F were not claimed as a loss in the victims' statements but were not eliminated by Agent Campbell.

      c.      The PSR does not identify a specific loss number to any of the 12 victims, or any of the other banking institutions identified in Schedule F.

31.      Agent Campbell prepared Exhibit F and G which were presented as "Alternative Loss Calculations" and included the 19 HSBC properties listed in her Schedule A (and supporting evidence from the victim).  I have created a spreadsheet analysis that compared government's Schedule F to Government's Schedule A (and supporting evidence) that compares the HSBC victim loss calculations.  I have selected a few examples to highlight the critical inconsistencies between the two sets of data as follows:

### 8434 Walerga Rd. (Loan 6169/699)

      a.      Schedule F: Foreclosure Date 9/30/2010, Approximate Resell Date 2/16/2011, Resell Amount $66,310.00, Loan Amount less Resell Amount $85,890.00 (loss calculated by FBI)

      b.      Schedule A: Victim statement loss attributed to "Make Whole," Dated 6/25/2013, Loss Amount $118,894.95.  Investor/Current owner FHLMC.

    **Summary:**  Dates of losses conflict since victim states "6/25/2013" loss due to "make whole" not on foreclosure sell.  Schedule A does not show sell to FNMA

Declaration of Carl R. Knudson
October 9, 2021

---

soon after funding and Schedule A does not show credits on mortgage payments made for approximately 4 years.   Schedule F shows property foreclosed "2/16/2011" but does not show sell to FHLMC or any credits received on mortgage payments.  Schedule F does not show whether FNMA foreclosed, or some other entity foreclosed, nor does Schedule F show the new buyer of the property.

### 8434 Walerga Rd. (Loan 415)

a.      Schedule F: Approximate Resell Date 9/16/2011, Resell Amount $57,500, Loan Amount Less Resell Amount $118,750.00 (loss).

**b.**      HSBC Schedule and Schedule A: Loss attributed to "Make Whole," Date 11/12/2012, Loss $126,613.52. HSBC indicates FNMA current owner (2015).

**Summary**:  Dates of losses conflict, the type of loss conflicts, and that FNMA is current owner (2015) is a significant issue that needs an explanation. Schedule F does not name whether FNMA foreclosed, or some other entity foreclosed, nor does Schedule F show the buyer of the property.

### 16013 S. Desert Foothills PKWY, Phoenix, AZ (Loan 4842)

Schedule F: Date of Foreclosure 8/27/2010, Approximate Resell Date 2/16/2011, Resell Amount $57,000, Loan Amount Less Resell Amount $132,650.00 (loss).

a.      HSBC Schedule and Schedule A: Loss attributed to "Make Whole," Date 1/13/2012, Loss $167,730.09. HSBC indicates FNMA current owner (2015).

**Summary:**  Schedule F shows property foreclosed August 2010 and resold February 16, 2011 and loss attributed to foreclosure is $132,650 but Schedule A attributes "make whole" as attributed to the loss dated 1/13/2012.  HSBC in their loss claim does not mention a foreclosure date and shows the current

Declaration of Carl R. Knudson
October 9, 2021

investor/Owner as FNMA.  The two sets of data provided by the government conflict with each other.

32.      Analysis of the HSBC loss claim data provided to Agent Campbell on 19 properties which Campbell summarized on Schedule A, shows that Campbell excluded critical information provided by the victim bank related to the "Investor/Current owner" which showed that as of 2015, HSBC and repurchased 6 of the 19 victim loans, and the FNMA was the current owner of 12 of the 19 victim loans.

     a.      Campbell's declaration makes no mention of this critical information which would cast serious doubt on whether any of the loss claims by HSBC were valid.  Further, when comparing Schedule A to Schedule F, both prepared by Agent Campbell, the critical contradiction on dates and events were not explained or apparently not recognized by Campbell.

     b.      Moreover, Schedule F does not identify the name of the person(s) foreclosed upon, nor the identity of the person who purchased the property.

**Profit Analysis**

33.      My analysis of the government's $10M and $12M loss calculations has shown that both attempts by the government to provide the court with reliable loss numbers in fact fall well short of addressing the "Morris" issue as stated in the 9th Circuit's remand in July 2020.  However, as detailed in paragraphs 17 to 32 of my declaration, the "Morris" issue is only one of many problems with the government's attempted loss calculations.

     a.      The original sentencing guidelines calculation was based upon the $10M loss calculation as detailed in Agent Campbell's original 2018 declaration. Based upon the 9th Circuit remand, the government adopted a new loss calculation

Declaration of Carl R. Knudson
October 9, 2021

which increased the loss to $12M and seemingly abandoning the previous $10M loss calculation.

34.    The Federal Sentencing Guidelines provide for a Profit analysis in determining a loss calculation for sentencing purposes when other methods are not reliable.  Further, Campbell's declaration dated 5/14/2018 included Schedules A through G, which included the $10 million and the $12 million loss calculations and were possibly considered by the 9th Circuit Court of Appeal.

35.    In the SIXTH ADDENDUM TO THE PRESENTENCE REPORT dated 9/28/2020, the PSR stated:

> "In light of the 9th Circuit Court remand, the Government has provided the Probation Officer with a revised loss calculation in accordance with mortgage loss calculations discussed in *Morris*. That calculation is (1) take the entire value of the principal of the loan; and (2) subtract any amount recovered or recoverable by the creditor from the sale of the collateral. The Government identified 109 properties associated with the defendant's conduct. The victim lenders suffered losses of at least $12,003,528 as a result of foreclosures on these properties. Specifically, the total loan amount for the subject properties was $21,586,216, of which $9,582,688 was recovered from the total resale amount. The PSR has been revised to reflect the new guideline loss amount as calculated above."

36.    The new PSR refers to a communication with the government who provided the $12 million loss number methodology but does not provide a specific loss amount related to any of the 12 "victim lenders."

a.    In fact, as established in my declaration at pages 27-33, the new loss number is based on a completely different set of unverified data that was created

25

Declaration of Carl R. Knudson
October 9, 2021

from an FBI real estate database and apparently summarized in Agent Campbell's Schedule F.  I have seen no evidence that Agent Campbell has claimed to be an expert in real estate or mortgage banking, and I believe that Agent Campbell testified as a summary witness at the trial of Maher Obagi or Momoud Aref Abaji.

b.      Without further explanation from the government, the $12 million loss calculation is not reliable and has not been established with credible evidence with testimony from a competent witness.

37.    In the government's supplemental sentencing position dated 5//14/2018, the government stated:

"The bank records summarized at trial show: (1) payments totaling more than $892,000 of fraud proceeds made to defendants Obagi and Abaji – through bank accounts set up in defendant Obagi's name (Exhibits 8 and 9), including payments starting as early as June 2007 and continuing through July 2009; (2) payments of more than $254,000 that defendant Obagi himself received from the fraud from units purchased in his name (Exhibit 13); and (3) payments of more than $825,000 made to defendant SALAH…" (page 4,  "1.  Documentary Evidence")

38.    In the sentencing of Ali Khatib on 8/27/2019 (Exhibit 8), the sentencing Judge made the following comments:

Khatib "Profited the most" p34

".but significant sums were made by the defendant, not by Ms. Burchell, and I've considered all of those things." (Page 42)

"I need to think about disparities." (Page 41)

Declaration of Carl R. Knudson
October 9, 2021

39.     In the sentencing of Jacqueline Burchell 4/30/2019 (Exhibit 9), the
sentencing Judge made the following statements:

"Ms. Burchell's financial interest was minimal.  She only received her salary
and a $500 bonus and a $100 bonus.." (page7)

"Here the amount of loss largely comes because the misconduct took place
at a peak in the market which then failed.  Okay.  It's interesting how the
sentencing guidelines don't affect that." (page 26)

Ms. Uyeda (attorney for Ms. Burchell), "I think your Honor in addition to
the inflated guideline amount also brings up a good point about the disparity
between loss and actual profit.  Here Ms. Burchell's profit is minimal
compared to the $17 million loss that she's attributed with per guidelines."

The Court, "These are difficult questions, and I am informed by the
guidelines but not controlled by them.  Thank goodness." (page 27)

The Court, "Maher Abaji and Aref Abaji in this case, the two brothers,
profited **$892,000**.  Maher got 78 months, and Aref received 104 months.
So taking those into account, the $600 that Ms. Burchell got as a bonus in
addition to her salary is significant." (p27-28)

a.      I have noted that the $17 million loss calculation was identified in
Campbell's declaration, that also discussed the $10M and $12M loss
calculations and likely all three were considered by the 9th Circuit during
their review.

b.      I disagree with the sentencing Court's characterization of "profited"
since there was no testimony by FBI Agent Campbell that her Exhibit 1 was
a "profit" calculation.  The term proceeds would be more accurate since

Declaration of Carl R. Knudson
October 9, 2021

there was no analysis by the government as to where the proceeds were
deposited and how the proceeds were spent.

40.    In Campbell's declaration, she provided copies of Exhibits that she indicated
were introduced during the trial of Aref Abaji.  Exhibit 8 was a chart that
summarized "Money from Excel to Momoud Aref Abaji & Maher Obagi, June
2007 – September 2009."  The chart then displays an amount of $892,111 in a box
that lists five entities and bank accounts with arrows pointing to persons of
amounts received:

   Momoud Aref Abaji – Obagi 4 Real Estate - $53,935 (account is not listed)
   Maher Obagi CRP, Inc. - $588,598 (account is not listed)
   Father – Ahmad Samir Abaji - $175,045 -note; deposited to Maher x6812
   Sister – Racha A. Abaji - $74,533 -note; deposited to Maher x6812

41.    Exhibit 9 (Trial Exhibit) then provided detail to Trial Exhibit 8 listing
checks from Capital Zone Funding, Faris Realty, Event Marketing, Escrow Quick,
by date order, amount and "made payable to."

42.    I obtained the trial transcript of Momoud Aref Abaji, February 3, 2016 (107
pages).  Testimony of Heather Campbell.  Schreiber defense counsel.  Portions of
Campbell testimony:

   Page 14, Q. Working on investigation? A. Since 2010

   Page 17, A. "I reviewed the case file, I requested additional business
   records.."

   Page 19, Q. Excel by other names? A. yes, Event Marketing, Faris Realty,
   OCPM, Chin, Capital Zone Funding.

Declaration of Carl R. Knudson
October 9, 2021

Page 21, Q. Look at other potential targets? A. Yes, Escrow-related individuals and builder-related individuals.

Page 22, Q. How many loan files have you collected in your investigation? A. Somewhere around 80.

Page 24, Q. Did you consider the information that you reviewed to create these schedules reliable? A. Yes

Page 50, Q. Exhibit 8, what's reflected on this exhibit? A. This is a summary of the payments that were made from Excel or one of its companies or EscrowQuick to Aref Abaji or his company, Abagi For Real Estate, Maher Abaji or his company, Crp. Inc.. Their father, Ahmad Obaji, and their sister, Racha Abaji.

Page 50, Q. in your interview with Aref Abaji, did he admit that the money directed to his father and sister was actually him.? A. Yes.

Page 51, Q. Why include information that was paid in the name of the brother? A. Because I noticed there was a lot of cash transactions, cash coming of Maher's account and cash going into Aref Abaji's account.

Page 52, Q. Exhibit 9? A. it lists all the checks that add up to that $892,000. So it shows which entity made the payment, what the check number was, the date on the check, the amount and who the was made payable to.

Page 61, Q. In total, how much was deposited into Defendant's brother's bank accounts for the units that Amer and Maher purchased in their names? A. $254,530.

Declaration of Carl R. Knudson
October 9, 2021

Q, And how does that number relate to the $892,000 number that is in Exhibit 8 and 9? A. It's a portion of that 892. This $254,000 is included on that larger schedule.

43.    I have obtained and reviewed the trial testimony of FBI agent Campbell dated March 20, 2015 (Vol I)(135 pages) re Maher Obagi and Mohamed Salah. Testimony related to Exhibit 8 was on pages 41-43 and testimony on Exhibit 9 was at pages 43.

    a.    Exhibit 8 testimony:

    page 41, Lines 8-14: A. Payments from Excel-related companies or EscrowQuick that went to Momoud Aref Abaji, Obagi 4 Real Estate, Maher Obagi, California Realty Plus, Ahmad Samir Abaji, Racha Abaji.

    page 41, line 15-16,  A. $892,211 "That's a total of all the checks that I traced from these entities to those individuals."

    Page 42, line 11-12, $588,598 A. ".the total amount of checks that went from these entities to either Maher Obagi or California Realty Plus."

    Page 42, line 13-25, money that Ahmad Samir Abaji and Racha Abaji received.  A. And the third reason is these checks were deposited to a Bank of America account held in Mr. Maher Obagi's name."

    Page 43, line 1-4, payments to Momoud Aref Abaji, Abaji 4 Real Estate, why did you include that in this chart?  A. "Because the accounting of the money was confusing.  There was money going back and forth between the individuals."

Declaration of Carl R. Knudson
October 9, 2021

44.    In summary, Agent Campbell's testimony about the $892,111 listed in government's trial Exhibit 8 and 9 is confusing and has been mistakenly interpreted to be a "Profit" or a benchmark for the loss calculation of Aref Abaji and an actual determination of a "profit" analysis was never undertaken by Agent Campbell.

a.    Agent Campbell ignored the fact that Mr. Abaji and Mr. Obagi were employees of Event Marketing and were likely paid for their work at Event Marketing or Capital Zone Funding.  However, Agent Campbell could have cleared up the confusion she created by asking Mr. Khatib, the owner of the Excel companies, and cooperating with the government, to review the QuickBooks accounting for the Excel companies.  Further, Agent Campbell could have asked Ms. Armstrong, the accountant for the Excel companies to look up the transactions on the QuickBooks accounting which would/could explain the purpose of all the checks listed on Trial Exhibit 8 and 9.

45.    Agent Campbell identified Excel checks written to Ahmad Samir Abaji and Racha Abaji and determined the checks were deposited to a Bank of America account held in Mr. Maher Obagi's name.  Trial Exhibit 8 indicates that $175,045 was paid to Ahmad Samir Abaji (Father) and $74,533 paid to Racha A. Abaji (Sister) and both deposited to Maher account 6182.  Agent Campbell then testified that Aref Abaji admitted that those checks were actually his.

a.    However, in Agent Campbell's 12/13/2011 interview (FBI 302, page 2) of Joyce Armstrong, Armstrong told Campbell "The checks Armstrong prepared for Mike were usually not written out to him.  They were written to the name Maher, and a name like Racka.  Aref's checks were written out to Aref."

Declaration of Carl R. Knudson
October 9, 2021

b.      Agent Campbell selectively chose cash withdrawals from Maher Obagi's account 6182 and then created Exhibits 23 and 26 to show cash withdrawn from account 6182 and purported deposits of cash to Mr. Aref Abaji's account ending in 2135.  Agent Campbell did not indicate if she had examined the cash deposits/withdrawals from the Excel Companies bank account or other bank accounts in the name of Maher Obagi in order to present a complete analysis of all sources of cash deposits and withdrawals.

c.      However, the government's analysis as to funds from the Excel companies that first went through Mr. Obagi's account 6182 does not recognize that any funds transferred from Mr. Obagi's account and subsequent checks written from the same account to Mr. Abaji would in effect double count the same monies.

46.     My analysis of Trial Exhibit 9, checks from the Excel companies totaling $892,111, showed that a total of $33,305.30 were paid to Aref Obagi (Abaji), and $11,630.09 paid to Obagi 4 Real Estate for a total of $44,935.39 for the period 2007 to 2009.  Agent Campbell testified that $53,935 was paid by the Excel companies to Mr. Abaji, and Obagi 4 Real Estate.

47.     After a diligent search of the discovery in this case, I have not found the bank account statements or summary schedules of the Aref Abaji 2135 account, and after reviewing the List of Witnesses and Exhibits in the Abaji trial (Exhibits 1-877) I found no indication that the Bank of America account ending in 2135 was provided to defense counsel.  I am informed by counsel for Mr. Abaji that he requested the Bank of America banking information for account ending in 2135, but there has been no response as of the date of this declaration.

Declaration of Carl R. Knudson
October 9, 2021

## CONCLUSIONS

48.    In July of 2020, the 9th Circuit remanded the case back to the sentencing court and on September 28, 2020 a PSR was submitted to address the noted "Morris" issue.  Rather than correct the "Morris" issue on the $10 million loss calculation attributed to 12 victim banks, the Probation Department provided a substantially different loss calculation of $12 million with no authentication from the prosecution on who will testify to the new loss calculation and what evidence provides the foundation for a new loss calculation despite the fact that it has been over a year since the date of the PSR and just three weeks before sentencing.

49.    My review of the new $12M loss number establishes that the new loss number is based upon a completely different set of circumstantial evidence that does not include a victim statement nor is there a loss number attributed to any of the 12 victim banks previously identified in the $10M loss calculation.  In my review of the $12M loss evidence as shown in Schedule F, there are substantially more than 12 victim-lenders related to the 109 properties.

50.    Further, the new loss calculation is not explained by a prosecution witness on how it addresses the "Morris" issue cited by the 9th Circuit or what the prosecution did to remedy the issue.  The defense has received no communication from the prosecution in order to provide a rebuttal to their stated position.

51.    As established in this declaration, the government's $10M loss calculation evidence and summarized in Agent Campbell's Schedule A is flawed and not accurate as to the victim lender's proffered loss evidence.  Further Agent Campbell's Schedule A is actually shown to contradict the property analysis that was compiled by Agent Campbell and summarized in Campbell's Schedule F.

Declaration of Carl R. Knudson
October 9, 2021

52.    Agent Campbell testified that Mr. Abaji received $53,935 directly from the Excel Companies and also included $175,045 paid to Ahmad Samir Abaji (Father) and $74,533 paid to Racha A. Abaji but Agent Campbell failed to examine any of the accounting of the Excel Companies or interview witnesses who could have testified as to the sources of the funds (legal or not) used to make the payments and provide a purpose for the payments at or near the time the transaction was recorded by Janice Armstrong.

**OPINION**

53.    The Government's Trial Memo 1/14/2006 for Momoud Aref Abaji stated, "Overview:

From approximately 2007 until 2009, defendant, along with his co-conspirators, <u>participated</u> in a "builder-bailout" mortgage fraud scheme. Defendant perpetrated this scheme with Khatib, Tbakhi, Obagi, Burchell, El Tahir, and Salah.." Defendant and the other organizers knew that condominium developers across the country held large amounts of unsold inventory in developments that had been planned and constructed before *the housing market began to contract* in 2007, and they knew that the developers were highly motivated to sell *overpriced* units in their inventory at inflated list prices so as to prevent a sudden drop in those homes' prices and the prices of the remaining units in the developments. **<u>The co-conspirators were also aware that many of these developers would be willing to pay large cash incentives (i.e., kickbacks) in exchange for being able to sell their units at *artificially-inflated prices*</u>**. Defendant, **Khatib, and Tbakhi** thus sought to locate such sellers and negotiate discounts on prices."

54.    In my opinion, a "Profit" analysis under the Federal Sentencing Guidelines is appropriate in this case and is consistent with the Sentencing Transcripts for Mr.

Declaration of Carl R. Knudson
October 9, 2021

Khatib and Ms. Burchell where the Sentencing Court used the $10M loss amount
for "restitution" but used a somewhat hybrid "profit" analysis in determining the
period of incarceration.

      a.    The sentencing transcripts showed that Khatib was given a 27-month
period of incarceration based upon the court's finding that Khatib received
approximately $1.4 million from the scheme, and that Ms. Burchell received a 5-
month sentence based upon the $600 bonus she received from her employer.

      b.    It was noted by the sentencing Judge that Khatib was the most
culpable, but at the beginning of the scheme it was legal, but then things changed.

55.    The Government's Schedule A and Schedule F which attempt to establish
the $10 million or the $12 million victim-loss amount do not comply with the
sentencing guidelines re "Morris" and are not reliable for the determination of a
"victim" loss in this matter.

      a.    Schedule F is not a statement from the victim lenders but merely a
summary of the FBI real estate database on certain parcels and does not identify a
loss to any of the previous 12 Victim Banks.  As established in my declaration, the
victim loss evidence presented by the government is not reliable and conflict with
each other on numbers of victims and amounts of losses attributed to purported
victims.

56.    The Excel Company funds attributed to Mr. Abaji by the government's
investigation established that he received $53,935 and it is my opinion that this is
the most reliable number for the court to consider in Mr. Abaji's resentencing.
However, the Court should consider that those funds likely represent a portion of
Mr. Abaji's salary from the Excel Companies.

Declaration of Carl R. Knudson
October 9, 2021

a.      In the sentencing of Ms. Burchell, the Court concluded that salary should not be included, but that her $600 bonus should be considered.  The Court noted, "Is it their fault they (generally) committed a crime at the peak of the market." (Sentencing transcript, (p27; 3-7).

b.      Trial Exhibit 8 also showed payments to Mr. Abaj's father and Mr. Abaji's sister.  Agent Campbell testified that Mr. Abaji admitted that those were actually his funds.  However, Ms. Armstrong stated that checks paid by Excel for Aref Abaji were actually paid to his name (not others).  So a conflict exists between two witnesses on the $175,045 paid to Ahmad Samir Abaji (Father) and the $74,533 paid to Racha A. Abaji for a combined total of $249,578.

c.      In my opinion, in order for the government to consider the $249,578 as proceeds paid to the benefit of Mr. Abaji, an analysis of the withdrawals from the Obagi 6182 account should have been conducted, which unfortunately it wasn't.

57.   In my opinion and based upon my research of the 2008 Financial Crisis, there has to be a realistic discussion as to the impact made by the Builder/Owner of the Condominiums, the contribution made by the "lenders" who appraised the properties, and the contribution made by the state of the economy, during the duration of the alleged scheme (2007 to 2009).

I declare under penalty of perjury under the laws of the United States and the State of Utah that the above is true and correct to the best of my knowledge and belief.

DATED:    10/09/2021              By: *Carl R. Knudson*
                                        CARL R. KNUDSON

# EXHIBIT 1

## *Carl R. Knudson*
*Forensic Accountant, Private Investigator and Certified Fraud Examiner*

### Professional Experience

Consulting, Investigations, and expert testifying services related to government law enforcement and white-collar investigations, both criminal and civil matters. Former IRS special agent experienced in the investigation and prosecution of complex white-collar crime violations. Served as summary fact witness and as expert witness in federal and state court proceedings regarding criminal and civil matters. Areas of expertise include: tax fraud, federal and state money laundering schemes, federal money structuring schemes, wire fraud schemes, mail fraud schemes, bankruptcy fraud schemes, SEC violations, bank fraud schemes, loan fraud schemes, mortgage banking fraud, narcotics trafficking, Ponzi schemes, pyramid schemes, telemarketing schemes, political corruption schemes, and embezzlement schemes.

### *As a Consultant*:

- Managed and conducted engagements into internal embezzlement schemes by corporate officers employed at high tech companies, construction companies, insurance companies, hotel management companies, hospitals, HMO's, not-for-profit organizations, city government and casinos. Coordinated investigative and forensic accounting efforts with external counsel, general counsel, human resources and the internal accounting staff. Traced flow of embezzled funds through corporate books and records, bank accounts and internal backup documents. Reviewed audit work papers to assess whether SAB 99 (fraud audit considerations) were considered. Assembled evidence and provided written and oral reports to board of directors and other corporate officers. When appropriate obtained technical expertise to preserve evidence on accused's computer hard drive. Testified in civil and criminal proceedings regarding my findings.
- Conducted a "Management Review" of the San Luis Obispo County Sanitation District (SSLOCSD) covering a 27-year period (2015-2016). Analyzed the management, bookkeeping and accounting process at the SSLOCSD and provided flow charts demonstrating use of District funds. Documented allegations of conflict of interest, fraud and malfeasance by District Manager and Engineer. He subsequently pled guilty. Provided a 120-page report of investigation to Board of Directors and gave an hour-long summary to the Board of Directors and the public during a public hearing.
- Conducted an Investigation of the San Luis Obispo Waste Management Organization (IWMA) regarding misuse of government funds; provided reports and schedules to Citizen Group who forwarded reports to District Attorney and Federal Bureau of Investigation (2018) Recent activity by the DA's office resulted in criminal charges against staff at the IWMA (August 2021).
- Conducted international warranty fraud investigation for prominent computer manufacturer that had purportedly been overcharged $100 million by its service providers. Participated in the design and implementation of analytical approaches to mining a large data field that culminated in attaining bottom-line warranty loss figures for client. Coordinated field investigations of alleged fraudsters and provided report of findings to client. Worked with client in designing reports to SEC regarding "materiality" issues on fraud loss.

Carl R Knudson
Resume August 2021

---

- Conducted investigation for California city government regarding allegations of corruption in the award of a $65 million construction project and subsequent "evaporation" of the funds from the project. The engagement team analyzed the government contracting process utilized in the construction and operation of the project, reconciled all bank accounts and traced funds to their origin. The team performed testing of account receivable and accounts payable to determine whether all income was reported and/or all expenses accounted for. Issued report to City Manager of our findings.
- Consulted on Bank of New York case as money laundering expert re alleged Russian Mafia laundering of billions of dollars through client wire room.
- Consulted for National Insurance Carrier in $74 million fraud-loss claim related to CEO fraudulent conversion of corporate monies.
- Consulted for International Insurance Broker, Fortune 50 Company re embezzlement scheme by vice president of accounting department. Conducted analysis of client accounting records and bank documents showing how the fraud was perpetrated against the client. Prepared report of findings for client, which was used to prosecute the fraudster.
- Consulted for national grocery chain regarding over-billing assertions by local government entities. Conducted statewide secret sampling of grocery chain stores, which rebutted assertions of local government allegations.
- Consulted for International Religious organization regarding embezzlement of church funds by Chief Financial Officer. Analyzed accounting records for five-year period of time and provided report to document findings of embezzlement.
- Consulted for Los Angeles Public Golf Course operator accused of arson to prevent government audit of books and records of golf course. Recovered relevant records needed for audit request from burned out storage area where accounting records were stored.
- Engaged by the defense in US v. _Weider_ (May 2005) to provide analysis of government's allegations of narcotics money-laundering. Analyzed the government's evidence and provided report to rebut government's assertions. Assisted counsel in trial during cross-examination of government's money laundering experts.
- Engaged by defense counsel in US v. _Ealy_ (March 2008) to provide analysis of government's allegations of narcotics money laundering against client. Analyzed government's purported evidence of the crime and also assisted counsel in developing the strategy that rebutted the government's assertions.
- Engaged by an international construction company to investigate embezzlement from Political Action Committee (PAC) bank accounts. Documented internal embezzlement scheme and reconciled accounting records to restated FEC reports.
- Engaged by counsel to assist in defending client in divorce proceedings. Created database and analyzed 15 years of bank transactions involving over 25 bank accounts. Reconciled all accounts and traced personal and community property transactions. Prepared several reports related to Marital Standard of Living analysis to be used in settlement proceedings.
- Engaged by Arizona hospital that suspected the CEO and CFO had embezzled millions from company bank accounts. Reconciled company bank accounts and analyzed accounts receivable and accounts payables for anomalies. Analyzed the health provider contract

2

Carl R Knudson
Resume August 2021

(capitation rates, industry standards, and reasonableness tests) in politically charged situation. Presented findings and conclusions to Board of Directors and hostile physicians.

- Engaged by counsel in civil fraud case to assist multinational client in recovering millions of dollars in fraudulently obtained funds. Constructed several large databases used to trace flow of funds in and out of "fraudsters" bank accounts. Provided reports of findings to Bankruptcy Court and to counsel.
- Engaged by counsel to provide cash flow analysis of funds between numerous related entities being investigated by the FTC. Analyzed internal documents, bank statements and prepared report of findings.
- Engaged by State Department to provide expert analysis of billion-dollar embezzlement, money laundering and bankruptcy scheme by high-ranking official in foreign country. Also provided training to foreign government officials relative to conducting complex financial investigations.
- Engaged as expert in US v Somoza to provide expert analysis of multi-million dollar embezzlement scheme and money laundering charges (2007)
- Engaged as expert in US v. Anthony Pendleton (August 2009) to provide analysis of IRS charges regarding multiple-filer scheme.
- Engaged as expert in USA v. Annya Nguyen to provide analysis of IRS charges regarding failure to file quarterly corporate tax returns (August 2009). Prepared IRS quarterly tax returns for client's corporations for a four-year period.
- Engaged by client to reconstruct six years of business and banking records for several limited partnerships and personal returns.
- Engaged as expert by counsel in US v. Samual and Zipoora Klein to provide tax loss calculation using the "Bank Deposit" method of proving income.
- Engaged as expert by counsel in US v Grim to provide analysis related to money laundering charges (2011)
- Engaged as expert by counsel in US v. Gilbert Camero to provide analysis of identity theft and bank fraud charges against client.  Reviewed discovery and provided report to counsel (2012).
- Engaged as expert by counsel in US v. Johnny Stewart to provide analysis of identity theft and bank fraud charges against client.  Reviewed discovery and provided report to counsel (2012).
- Engaged by general counsel to perform a nationwide investigation of a major electronics vender.  Investigative team visited over 100 stores and conducted assessment of how vender's product was being promoted.  Prepared reports of findings to general counsel (2013).

- Engaged by counsel to review trial evidence in People v. Rio Appling who was convicted of assault in Los Angeles Superior Court.  Uncovered evidence that rebutted government's allegations; defendant was exonerated by the court.
- Engaged by counsel to review government loss calculation in USA v. Edgar Shakbayzan Medicare Fraud.

Carl R Knudson
Resume August 2021

- Engaged by counsel to review government loss calculation in USA v. Andranik Aloyan, RICO, Drug Charges and Identity Theft.
- Engaged as expert by counsel to review and analyze government discovery re Shontrice James, et al; accused of money laundering and drug conspiracy (2017)
- Engaged by counsel to review government loss calculation in USA v. Thomas Matsuba, et al; Wire Fraud, Mail Fraud, Bank Fraud.  Provided counsel a detailed declaration with exhibits that rebutted government's loss calculation (2017-2018).
- Engaged by counsel to review government $21M criminal tax calculation re multi-year tax evasion scheme.  Provided analysis of government discovery and provided report that refuted alleged tax loss.  (2018)

### *As an Expert Testifier:*

- Testified as expert in Los Angeles Superior Court re People v. Gaspar.  Lone defense witness as expert on 79 Fraud charges; jury acquitted on all 79 fraud charges (July 2021).
- Testified as expert in Santa Ana Superior Court re People v. Kris Ryann (July 2018) regarding allegations of embezzlement and money laundering.  Analyzed discovery related to charges, and designed exhibits for direct examination.  Provided cross examination template for defense counsel.
- Testified as expert in Los Angeles Federal Court re US v. Queen Anieze-Smith (April 2015) regarding allegations of Medicare Fraud.  Analyzed discovery related to the charges and designed templates and exhibits for my direct examination, which rebutted government's analysis of the expenditure of government funds.  Also provided templates for cross examination of government's expert-summary witness.
- Testified as expert in Santa Ana Federal Court re US v. Christian Powell (August 2014) regarding allegations of Mail Fraud, Wire Fraud and Money Laundering.  Analyzed discovery related to the charges and designed templates and exhibits for my direct examination, which rebutted government's analysis of the expenditure of investor funds. Also provided templates for cross examination of government's summary witness.
- Testified as expert in Santa Ana Federal Court re US v. Charles M. Davis, Pro per (June 2014) regarding allegations of Mail Fraud, Wire Fraud and Money Laundering.  Analyzed discovery related to the charges and designed templates and exhibits for my direct examination, which rebutted government's analysis of the expenditure of investor funds.  Also provided templates for cross examination of government's summary witness.
- Testified as expert in Los Angeles Federal Court re US v. Bart *Slanaker*, et al (April 2012) regarding allegations of Telemarketing Fraud, mail fraud and wire fraud.  Analyzed discovery related to the charges and designed templates for my direct examination.  Assisted defense counsel in constructing cross-examination of government expert.
- Testified as expert in Los Angeles Federal Court re US v. Charles *Vandevort* (July 2010) regarding allegations of bankruptcy fraud and money laundering. Analyzed discovery related to the charges and designed template for my direct examination. Assisted defense counsel in constructing cross-examination template of government expert.

Carl R Knudson
Resume August 2021

- Testified as expert at Pomona Superior Court Mao v. _Hsieh_ (June 2010) re civil fraud allegations. Analyzed bank account documents, loan documents, real estate documents and accounting records. Designed spreadsheet analysis to support assertions of fraudulent activity by other investors. Designed template for my direct examination by counsel.
- Testified as expert in Los Angeles Federal Court, US v. _Ronald Rakow and Denise Del Bianco_ (July 2006) on criminal tax charges. Provided alternate tax loss calculations, which contradicted the government's allegations of tax evasion.
- Testified as expert in Los Angeles Superior Court, People v. _Maritza Martinez_ (January 2002) re drug money laundering charges. Analyzed government's evidence and provided rebuttal report to counsel. Government subsequently dropped charges and case was dismissed with prejudice.
- Testified as expert in US v. _Anne Masters Sholtz_ (April 2008) to provide loss analysis of client's alleged multi-million-dollar fraud-Ponzi scheme. Provided in depth analysis of energy trading credits that showed victim's fraud-loss was zero. Sentencing judge agreed with my loss calculation of no loss.
- Testified as expert in the defense of CEO accused of evading over $2 million in federal taxes. Reviewed government's evidence of alleged scheme and provided report of findings to counsel showing government's assertions to be substantially overstated. In civil IRS case that followed, prepared further analysis of IRS civil findings that rebutted alleged tax loss reasserted.
- Engaged by counsel to assist in the defense US v. _Lynn Meredith_, et al. Client accused of Failure to File, IRS Klein Conspiracy and Mail Fraud. Provided analysis of government's evidence and attended 12-week trial. Also prepared ten years of delinquent federal and state tax returns for other defendant in same case.
- Testified as expert in US v. _Osaki_ re $350 million "Ponzi" scheme. Provided analysis of government's assertions and issued report that showed the government's expert had used a "plug" figure in their analysis of the defendant's bank accounts, which caused an overstatement of the alleged fraud loss.
- Testified as expert in civil fraud proceedings in re: DAS Corporation v. _Christopher and Erica Kim,_ Optional Capital v. Christopher and Erica Kim and US v. 475 Martin Lane, Beverly Hills, CA. All three proceedings related to an alleged $24 million embezzlement and money laundering scheme. Plaintiffs including the US Attorneys Office (USAO) in Los Angeles. Testified in several depositions and prepared declaration of findings to rebut plaintiff's expert testimony.

- Testified as expert in Los Angeles Federal Court in re US v. _Stephen Sayre_. "Pro Se" client re financial analysis of stock trading trends and profits in alleged SEC 10b5 violations. Analyzed data provided by FINRA re trading of various stocks which rebutted government's assertions of stock manipulation.
- Testified as expert in Los Angeles Federal Court in re US v. _Gerald and Patricia Green_ (September 2009), re Foreign Corrupt Practices Act (FCPA), False Corporate Tax Returns, Money Laundering and obstruction case. Provided analysis of client's accounting records,

Carl R Knudson
Resume August 2021

bank accounts, and work papers of tax preparer. Prepared summary chart of my findings that rebutted government's allegations. Assisted counsel during cross-examination of government witnesses during four-week trial.

- Testified as expert in Santa Ana Federal Court in re CFTC (Commodities Future Trade Commission) v. _Forex Liquidities, LLC_ (July 2009) order to show cause action against client. Reviewed client general ledger, trustee's report of findings, and related bank documents. Provided report that rebutted assertions of appointed trustee.

- Testified as expert in Los Angeles Federal Court in re, US v. _Steve Austin_ (August 2009) conducted extensive analysis of client investment records, which rebutted the alleged government loss calculation.

- Testified as expert in Los Angeles Superior Court in re People v. J_ustice Edem_ (July 2008) conducted analysis of government discovery, which rebutted the government's assertions of tax fraud.

- Testified as expert in Los Angeles Federal Court in re US v. _Khaled Amed,_ conducted analysis of extensive government accounting database related to payments to client business entities. Analyzed business billing records related to medical fraud charges.

- Testified as expert in Los Angeles Federal Court in re US v. _Rafael Yepez,_ conducted analysis of government discovery and provided report to counsel, which rebutted the allegation of money laundering.

### _As a Special Agent_

- Developed the investigation of the largest known narcotics money laundering organization in U.S. history. Coordinated the nationwide investigative efforts of the IRS, DEA, FBI and U.S. Customs Service personnel with the Los Angeles United States Attorney's Office ("USAO"). The investigation, known as "Polar Cap," revealed that over $1 billion in U.S. currency had been laundered by a Los Angeles-based organization for the infamous "Medellin" Columbia Cartel. Supervised the collection and analysis of all financial data, which documented the flow of currency from "Cartel" collection points, through the Los Angeles based money launderers and subsequently wire-transferred to a South American money exchange account. Received "The Distinguished Agent of the Year" award from the Los Angeles County Bar Association in May of 1990 for this investigation. Exploits of this investigation were detailed in the book "Washed in Gold," (1994) _Simon & Schuster._

- Conducted investigation of an international entrepreneur that was accused of operating a "Pyramid" scheme in the U.S. Uncovered several sophisticated paper-schemes devised by he and his advisors in order to siphon-off tens of millions of dollars from the corporate entity. Traced the flow of the ill-gotten funds through a complex international money-laundering scheme, which attempted to secrete the ill-gotten gains into offshore bank accounts and into the control of the entrepreneur. Authored and co-authored numerous requests for assistance from government and bank officials from The Netherlands, Canada, Hong Kong, Switzerland and The British West Indies.

Carl R Knudson
Resume August 2021

- Conducted investigation with the Federal Bureau of Investigation ("FBI") and Los Angeles, United States Attorneys Office ("USAO") of a California politician who was receiving bribes from a local real estate developer. Provided the financial analysis of the politician's bank records that uncovered the fraudulent scheme and led to his conviction on tax and bribery charges.
- Conducted investigation with the FBI and Los Angeles USAO of political corruption in a local city's government. Provided financial analyses of bank records that resulted in convictions of City Councilperson and Congressman on tax and bribery charges.
- Assisted in the international investigation of a well-known arms dealer who brokered the purchase of U.S. aircraft between U.S. based aircraft producers with Mid-east Countries. Investigations involved IRC, section 162c violations regarding "bribes" paid by aircraft manufacturers.
- Led a team of IRS and Customs agents including local police officers that successfully arrested and prosecuted numerous Los Angeles-based narcotics traffickers. Authored numerous affidavits for search and arrest warrants obtained from federal and state judges. Seized over $2 million in currency and assets. Testified in California State Court as an expert in narcotics organizations. Exploits of several of these investigations were detailed in the book, "Dark Alliance," 1997, which was the basis for the movie "Kill The Messenger" (2015).
- Conducted investigations of several prominent "sports" agents who embezzled monies from their unsuspecting clients. Reconstructed three years of corporate bank records in order to document the embezzlement scheme and trace the stolen funds to the agent's bank accounts.
- Coordinated a multi-agency investigation of alleged fraud in the mortgage banking industry. Worked closely with the FBI and the Los Angeles USAO in the investigation of large-scale mortgage bankers who were defrauding the Veterans Administration ("VA") and the Department of Housing and Urban Development ("HUD"). Provided the financial analysis that tracked the proceeds from the illegal schemes to the fraudsters.
- Conducted several investigations into the Savings and Loan scandal that swept the country in the 1980's. Coordinated investigative efforts with the FBI and the USAO that focused on Savings and Loan officials using "straw buyers" to purchase over-priced commercial real estate that was then sold to tax-motivated property syndicates. Designed the financial investigation that documented the flow of funds from the illegal schemes to the perpetrators of the crime.

- Conducted investigations of several organized crime figures that had acquired substantial real estate holdings by defrauding financial institutions and tax shelter investors. Subjects acquired commercial real estate by using a maze of corporate and partnership alter egos and straw buyers. Reconstructed three years of partnership and corporate records in order to trace gains on illegal activity to the perpetrator.

### *Education:*

Carl R Knudson
Resume August 2021

Bachelor of Science, Business Administration, Weber State University, Ogden, UT, 1973
United States Navy, Office of Naval Intelligence Training School (1963)
Central Intelligence Agency technical school, 1967
United States Treasury Department academy, 1973-74
Continuing Professional Education to present

### *Professional Affiliations:*

Private investigators license #19339, California
Association of Certified Fraud Examiners (1995-current)

### *Employment History:*

United States Navy – 1962 to 1966
Central Intelligence Agency – 1967 to 1970
Internal Revenue Service, Ogden Service Center – August 1970 to March 1973
Internal Revenue Service, Criminal Investigation Division – May 1973 to June 1997
- Position: Special Agent
- Duties:   Investigate alleged criminal violations of the Internal Revenue Code, Currency Transaction Laws, and Money Laundering Laws.

Price Waterhouse & PricewaterhouseCoopers – June 1997 to June 1999
- Position: Director in the Financial Advisory Services practice.
- Duties:   Manage engagements regarding internal/external fraud investigations for Fortune 500 companies; Design marketing materials; Organize symposiums for presentation of marketing materials to various groups and organizations; Prepare proposals; and Mentor new-hires and junior consultants.
- Attended seminars and training sessions regarding accounting and auditing standards relative to the reporting requirements of publicly traded companies to the SEC.

KPMG – July 1999 to June 2000
- Position: Director in the Forensic and Litigation Services practice.
- Duties:   Manage engagements regarding internal/external fraud investigations for Fortune 500 companies; Design marketing materials; Assist in the organization of symposium's for presentation of marketing materials to various groups and organizations; Prepare proposals; and Mentor new-hires and junior consultants.
- Attended seminars and training sessions regarding accounting and auditing standards relative to the reporting requirements of publicly traded companies to the SEC.

Stonefield Josephson, Inc. - July 2000 to October 2000
- Position: Co-Director of Financial Recovery Services practice.

Carl R Knudson
Resume August 2021

---

- Duties:  Develop marketing materials to promote new Financial Recovery Services practice, prepare proposals, and prepared articles for presentation to market target-groups. Developed new work and managed projects.

November 2000 to the present, Owner-Operator of Knudson Investigations
- Provide consulting services to corporate, government and individual clients regarding civil and criminal allegations.
    - Testified as expert in Federal and State court proceedings.
    - Conducted internal and external investigations and fraud examinations for corporate clients
    - Provided expert consulting services to Federal Public Defenders office in Los Angeles regarding, bank fraud, money laundering, wire fraud, tax fraud, identity theft, telemarketing fraud and Ponzi schemes.
    - Provided expert consulting services to Criminal Justice Act (CJA) attorneys for indigent clients regarding, bank fraud, money laundering, wire fraud, tax fraud, identity theft, telemarketing fraud and Ponzi schemes.

### *Publications:*

Co-authored a professional training manual for the IRS on conducting international investigations.  The extensive training manual details the means, methods and requirements of obtaining evidence from abroad through international tax treaties and legal assistance treaties.

Authored article on "Conducting International Investigation" and presented at Price Waterhouse Symposium, September 1997.

Originated the Los Angeles White Collar Crime Symposium. The Symposium included panelists from the leading Los Angeles law firms and experts from the private and government sectors, which addressed issues regarding Financial Statement Fraud, 10b5 Violations and International Investigations of White-Collar Fraud, 1998 and 1999.

Co-authored article and presentation on financial reporting fraud (10b5 Violations), which was presented to a CFO conference in November 1998, and The Los Angeles White Collar Symposium in May 1999.

Authored article on "State Money Laundering Trends" for participation on panel of "Money Laundering" experts to the American Bar and American Bankers Association Conference in October of 1999.

Authored book on "State Money Laundering" statutes (February 2000).

Carl R Knudson
Resume August 2021

---

Co-authored article on "Earnings Management," which was published on KPMG's Website. Certain portions of presentation regarding 10b5 violations were used in the May 2000 KPMG Audit Roundtable symposia.

Co-authored article on "Earnings Management" which was presented at Business Valuation Services forum in May of 2001.

Lectured at California State University, Los Angeles on Economic Crime topics to group of Chinese law enforcement group in February 2003.

Lectured at Weber State University, Ogden, Utah on Financial Reporting Fraud, September 2003.

Lectured at Utah Bankers Association, May 2004 conference regarding Earnings Management Fraud and provided full-day seminar on white-collar crime subjects such as; Money Laundering, Tax Fraud, Identity Theft and Financial Statement Fraud.

Lectured at annual meeting of the Federal Judicial Center Seminar for Federal Public Defender Investigators and Paralegal Specialists, April 2006 regarding Financial Fraud Investigations.
Lectured at 22nd Annual Association of Certified Fraud (ACFE) Fraud Conference and Exhibition (June 2011) on the Fraud Expert in Litigation and Trial.

Co-Authored Book on Bribery and Corruption Case Book with Joseph T. Wells, President and Founder of the Certified Fraud Examiners Association (April 2012).

Authored White Paper on Combating Government Vendor Fraud (Thomson Reuters) (April 2012) and updated July 2018).

Co-Authored Book on Insurance Fraud Casebook with Joseph T. Wells, President and Founder of the Certified Fraud Examiners Association (April 2013).
*__Awards and Recognition:__*

Key to City of Hawthorne, California for investigation into Political Corruption in the South Bay, 1977.

Key to City of Redondo Beach, California for investigation of Political Corruption of councilman, 1978.
Key to City of Bell, California for investigation of drug traffickers and seizure of assets, 1986.

Special award from United States Customs Service for investigation of narcotics traffickers.
Distinguished Agent of the Year Award, Los Angeles County Bar Association, 1990, for "Polar Cap" investigation.

Carl R Knudson
Resume August 2021

---

Albert Gallatin Award for distinguished services to US Treasury during career, 1997

Special Proclamation from City of Los Angeles upon retirement, 1997

Special Proclamation from Los Angeles County Board of Supervisors upon retirement, 1997

Special award from Federal Bureau of Investigation for investigation of Political Corruption, 1997 Project Briburn

Letter of Recognition, President Bill Clinton, 1997

References will be provided upon request.

Contact information:
Carl.knudson.pi@gmail.com
213-364-4474

# EXHIBIT 2

| Address | Approx. Settlement | Loan Amount | Loan # (last 4 digits) | 2nd page Investor/Current Owner | Loss Type | Date of Loss | Make Whole Amount | Charge off | Writedowns | Total Loss | Reference to Schedule A | Reconcile to Schedule A | Loss Amount | Foreclosure Date | Resell Date | Resell Amount | Ref. on Sked F. | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HSBC Loss - Campbell Declaration (4-5-2018)PDF pages 76-79) | | | | | | | | | | Schedule F - 2018 | | | | |
| 8434 Walerga Rd Antelope, CA | 9/3/2008 | $ 152,000.00 | 6169/699 | FHLMC | Make Whole | 6/25/2013 | | $ 118,675.00 | | $ 118,894.95 | A-43 | $ 118,675.00 | 85,890.00 | 9/30/2010 | 2/16/2011 | $ 66,300.00 | Line 28 | 5 years Mortgage payments, Sked A and F dates differ |
| 8434 Walerga Rd Antelope, CA | 12/15/2008 | $ 176,250.00 | 5464 | HSBC repurchased | Short Sale | 5/24/2013 | | $ 99,358.61 | | $ 109,751.60 | A-44 | $ 99,358.00 | 102,250.00 | n/a | 12/5/2012 | $ 74,000.00 | Line 34 | 5 years Mortgage payments, Sked A and F dates differ |
| 8434 Walerga Rd Antelope, CA | 1/30/2009 | $ 176,250.00 | 415 | FNMA | Make Whole | 11/12/2012 | $ 126,613.52 | | | $ 126,613.52 | A-48 | $ 126,614.00 | 118,750.00 | n/a | 9/16/2011 | $ 57,500.00 | Line 38 | 3 years Mortgage payments, Sked A and F dates differ |
| 8434 Walerga Rd Antelope, CA | 3/23/2009 | $ 176,250.00 | 6068 | HSBC repurchased | REO sale | 5/25/2011 | | $ 104,512.71 | $ 13,995.01 | $ 135,260.36 | A-50 | $ 118,508.00 | 117,250.00 | 1/4/2011 | 5/18/2011 | $ 59,000.00 | Line 49 | 2 years Mortgage payments, Sked A and F dates differ |
| 8434 Walerga Rd Antelope, CA | 3/17/2009 | $ 164,500.00 | 7627 | HSBC repurchased | Loan is Current | | | | | $ - | | $ - | | | | | Line 50 | 1 years Mortgage payments, Sked A and F dates differ |
| 8434 Walerga Rd Antelope, CA | 3/6/2009 | $ 188,000.00 | 2920/1292 | FNMA | Make Whole | 10/17/2012 | $ 145,121.67 | | | $ 153,165.24 | A-49 | $ 145,121.00 | 111,500.00 | 7/16/2010 | 9/15/2012 | $ 76,500.00 | Line 51 | 2 years Mortgage payments, Sked A and F dates differ |
| 8434 Walerga Rd Antelope, CA | 3/17/2009 | $ 176,250.00 | 3981/6278 | HSBC repurchased | 3rd Party Sale | 12/9/2014 | | $ 60,836.64 | | $ 72,734.25 | A-45 | $ 60,836.00 | 70,250.00 | 12/29/2014 | 12/29/2014 | $ 106,000.00 | Line 53 | 4 years Mortgage payments, Sked A and F dates differ |
| 8434 Walerga Rd Antelope, CA | 4/22/2009 | $ 176,250.00 | 5590 | FNMA | Make Whole | 4/1/2013 | $ 132,967.21 | | | $ 133,338.68 | A-51 | $ 132,967.00 | 108,750.00 | 6/15/2012 | 7/11/2012 | $ 67,500.00 | Line 58 | 4 years Mortgage payments, Sked A and F dates differ |
| 8434 Walerga Rd Antelope, CA | 4/29/2009 | $ 149,250.00 | 7308 | HSBC repurchased | Under evaluation | | | | | $ - | | $ - | $ - | 3/2/2018 | | $ - | Line 59 | |
| 16013 S. Desert Foothills PRWY, Phoenix, AZ | 12/1/2008 | $ 208,300.00 | 637 | FNMA | SFO final claim | 6/10/2011 | | | | $ 1,216.78 | | $ - | 126,300.00 | 2/11/2010 | 5/14/2010 | $ 82,000.00 | Line 71 | 2 years Mortgage payments, Sked A and F dates differ |
| 16013 S. Desert Foothills PRWY, Phoenix, AZ | 1/23/2009 | $ 189,660.00 | 4842 | FNMA | Make Whole | 1/13/2012 | $ 167,730.09 | | | $ 167,930.07 | A-47 | $ 167,730.00 | 132,650.00 | 8/27/2010 | 2/16/2011 | $ 57,000.00 | Line 74 | 2 years Mortgage payments, Sked A and F dates differ |
| 5855 N Kolb Rd., Tucson, AZ | 4/28/2009 | $ 171,350.00 | 203 | FNMA | SFO final claim | 11/14/2012 | | | | $ 180.00 | | $ - | 64,350.00 | 2/5/2011 | 6/9/2011 | $ 107,000.00 | Line 88 | Loss amounts and dates differ |
| 5855 N Kolb Rd., Tucson, AZ | 4/29/2009 | $ 147,000.00 | 9474 | HSBC repurchased | REO sale | 1/31/2012 | | $ 45,429.71 | $ 18,400.00 | $ 90,513.97 | A-46 | $ 63,829.00 | $ - | 7/28/2010 | Unclear | | Line89 | Loss amounts and dates differ |
| 5855 N Kolb Rd., Tucson, AZ | 7/9/2009 | $ 167,250.00 | 303 | FNMA | SFO final claim | 1/11/2013 | $ 60,396.09 | | | $ 60,371.09 | A-52 | $ 60,396.09 | 49,250.00 | n/a | 12/8/2011 | $ 118,000.00 | Line 99 | Sked A and F dates don't match. |
| 5855 N Kolb Rd., Tucson, AZ | 8/3/2009 | $ 150,000.00 | 4801 | FNMA | Make Whole | 12/12/2012 | $ 63,493.08 | | | $ 64,303.05 | A-53 | $ 63,493.00 | 34,500.00 | 1/31/2012 | 4/4/2012 | $ 115,500.00 | Line100 | FNMA is owner |
| 5855 N Kolb Rd., Tucson, AZ | 7/27/2009 | $ 161,200.00 | 395 | FNMA | SFO final claim | 8/30/2012 | | | | $ 1,206.50 | | $ - | 60,200.00 | n/a | 3/7/2012 | $ 101,000.00 | Line 105 | FNMA is owner |
| 5855 N Kolb Rd., Tucson, AZ | 8/6/2009 | $ 167,250.00 | 4035 | FNMA | Make Whole | 2/21/2012 | $ 87,749.45 | | | $ 86,946.63 | A-54 | $ 86,946.63 | 60,250.00 | 2/8/2011 | 7/27/2011 | $ 107,000.00 | Line 106 | FNMA is owner |
| 5855 N Kolb Rd., Tucson, AZ | 8/7/2009 | $ 146,250.00 | 2119 | FNMA | Make Whole | 5/29/2012 | | | | $ - | | $ - | $ - | n/a | Unclear | | Line 107 | |
| Totals | | $ 3,043,260.00 | | | | | $ 902,746.11 | $ 310,137.67 | $ 32,395.01 | $ 1,322,426.69 | | $ 1,244,473.72 | 1,242,140.00 | | | $ 1,194,300.00 | | |
| 19 properties | | | | | | | | | | | | | | | | | | |
| 7 repurchased claimed loss | | | | $ 328,536.96 | | | $ 842,350.02 | | | | | | | | | | | |
| 6 no loss | | | | | | | | | | | | | | | | | | |

# EXHIBIT 3

**Wells Fargo Losses - Schedules A and F**

| Date of Sale/Loan | Purchaser | Loan Amount | Loan # | Address | Schedule A — Make Whole to Fannie/Freddie | Schedule A — Foreclosure Sale or Short Sale Loss | Limited Losses | Campbell ref to Line Item on Sked A. | Bank Documentation | Bank Explanation | Schedule F - 2018 — Loss Amount | Reference on Spreadsheet | Detail on Spreadsheet | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/5/2008 | E.K. | $ 228,000.00 | 2202 | 4996 Town Terrace, Kissimmee, FL | 237,603.76 | | | A-60, p82 | May 8, 2015 WFB - | "represents a loss exposure" | $ 168,000.00 | Line 8, Wachovia | | Mortgage payments 2 years? |
| 8/29/2008 | N.K. | $ 180,000.00 | 3475 | 8434 Wakerga Road, Unit 921, VA | 139,819.54 | | | A-64, p82 | May 8, 2015 WFB - Loan losses | "represents a loss exposure" | $ 95,000.00 | Line 27 | | Foreclosure date 2/7/2011, resell date 6/9/2011, resell amount $85,000 | Mortgage payments 2 years? Sale to Freddie/Fannie? |
| 11/21/2008 | R.M | $ 214,965.00 | 6255 | 16013 S. Desert Foothill, Unit 1045, Phoenix, AZ | 148,678.00 | | | A-66, p82 | May 8, 2015 WFB - Loan losses | "represents a loss exposure" | $ 142,465.00 | Line 68 | Resell 5/18/2010, resell amount $72,500 | Mortgage payments 1 year Sale to Freddie Fannie? |
| 11/26/2008 | I.O. | $ 215,120.00 | 5129 | 16013 S. Desert Foothill, Unit 2014 (1014), Phoenix, AZ | 174,572.29 | | | A-62, p82 | May 8, 2015 WFB - Loan losses | "represents a loss exposure" | $ 141,620.00 | Line 70 Wachovia | Foreclosure 4/6/2010, resell 8/16/2010, resell amount $73,500 | Mortgage payments 1 year Sale to Freddie Fannie? |
| 3/12/2009 | J.S. | $ 239,920.00 | 204 | 16013 S. Desert Foothill, Unit 1009, Phoenix, AZ | 171,580.30 | | | A-69, p82 | May 8, 2015 WFB - Loan losses | "represents a loss exposure" | $ 162,400.00 | Line 75 | Foreclosure 8/10/2010, resell date 8/30/2010, $77,500, loan $239,920 | Mortgage payments 1 year Sale to Freddie Fannie? |
| 6/27/2009 | H.K. | $ 219,750.00 | 7095 | 16013 S. Desert Foothill, Unit 1117, Phoenix, AZ | 147,530.30 | | | A-70, p82 | May 8, 2015 WFB - Loan losses | "represents a loss exposure" | $ 138,501.00 | Line 80 | Foreclosure 8/17/2010, resell date 7/27/2010, $81,249; loan $219,750 | Mortgage payments 1 year Sale to Freddie Fannie? |
| 1/7/2009 | M.A | $ 188,000.00 | 5884 | 3830 E. Lakewood Pkwy, Unit 1114, Phoenix, AZ | 135,686.24 | | | A-67, p82 | May 8, 2015 WFB - Loan losses | "represents a loss exposure" | $ 127,900.00 | Line 83 | Foreclosure 8/17/2010, resell 8/17/2010, resell amount $60,100 | Mortgage payments 1 year Sale to Freddie Fannie? |
| 2/25/2009 | N.B. | $ 188,000.00 | 7455 | 3830 E. Lakewood Pkwy, Unit 1145, Phoenix, AZ | 139,575.51 | | | A-68, p82 | May 8, 2015 WFB - Loan losses | "represents a loss exposure" | $ 120,750.00 | Line 86 | Foreclosure 4/4/2011, resell 5/4/2011, resell amount $67,250 | Mortgage payments 2 years? Sale to Freddie/Fannie? |
| 11/20/2008 | H.I. | $ 202,320.00 | 561 | 16013 S. Desert Foothill, Phoenix, AZ | 161,549.81 | | | A-65, p82 | May 8, 2015 WFB - Loan losses | "represents a loss exposure" | $ 133,920.00 | Line 78 | Foreclosure 4/28/2009, resell date 10/11/2011, $68,400; loan $202,320 | Mortgage payments 1 year Sale to Freddie Fannie? |
| 12/23/2008 | Engy E Hassan | $ 188,000.00 | 9566 | 8434 Wakerga Road, Unit 1231, Antelope, VA | 118,954.31 | | | A-63, p82 | May 8, 2015 WFB - Loan losses | "represents a loss exposure" | $ 122,000.00 | Line 36, Wachovia | Resell date 1/30/2013, resell amount $66,000 | Not foreclosed per Sked F Mortgage payments 1 year Sale to Freddie Fannie? |
| 5/1/2008 | S.M. | $ 228,000.00 | 5852 (6852) | 4983 Towne Terrace, FL | | 212,175.09 | | p82 | May 8, 2015 WFB - Loan losses | "sold, foreclosure or short sale" | $ 171,000.00 | Line 9 | Foreclosure 2/14/2011, resell date 7/1/2011, resell amount $56,900 | Mortgage payments 2 years? Sale to Freddie Fannie? |
| 9/10/2008 | Nariman Khatib | $ 149,250.00 | 8897 | 8434 Wakerga Road, Unit 238, Antelope, VA | | 137,614.40 | | p82,71 | May 8, 2015 WFB - Loan losses | "sold, foreclosure or short sale" | $ 95,250.00 | Line 30 | Foreclosed 8/30/2010, resell 5/23/2011, $54,000, loan $149,250 | Mortgage payments 2 years? Sale to Freddie/Fannie? |
| 1/6/2009 | Ali Khatib | $ 178,000.00 | 3829 | 8434 Wakerga Road, Unit 1121, Antelope, VA | | 96,585.06 | | p82 | May 8, 2015 WFB - Loan losses | "sold, foreclosure or short sale" | $ 88,000.00 | Line 46 | Resell date 9/30/2010, $90,000, loan $178,000 | Note foreclosed per Sked F Mortgage payments 1 year Sale to Freddie Fannie? |
| | | | 5528 | 16013 S. Desert Foothill, Phoenix, AZ | | 131,965.55 | | p82 | May 8, 2015 WFB - Loan losses | "sold, foreclosure or short sale" | | | | Duplication, see A72 |
| 3/5/2008 | S.M. | $ 273,600.00 | 9905 | 2535 Old Kent Circle, Kissimmee, FL | | | 2,646.96 | p82 | May 8, 2015 WFB - Loan losses | "limited losses at this time" | $ 202,700.00 | Line 6 | Foreclosed 8/19/2009, resell date 11/5/2009; $70,900 resell, loan $273,600 | Note losses per Schedule A and F Mortgage payments 1 year Sale to Freddie Fannie? |
| 9/8/2008 | Nariman Khatib | $ 180,000.00 | 3475 | 8434 Wakerga Road, #921, Antelope, VA | | | 121.25 | p82 | May 8, 2015 WFB - Loan losses | "limited losses at this time" | $ 95,000.00 | Line 27 | Foreclosure 2/7/2011, resell date 6/9/2011, $85,000, loan $180,000 | Note losses per Schedule A and F Mortgage payments 1 year Sale to Freddie Fannie? |
| 6/4/2009 | Lina Elzaben | $ 149,250.00 | 6576 | 8434 Wakerga Road, #837 Antelope, VA | | | 30.00 | p82 | May 8, 2015 WFB - Loan losses | "limited losses at this time" | $ 57,250.00 | Line 62 | Foreclosure 7/23/2010, resell 8/12/2010, $92,000; loan $149,250 | Note losses per Schedule A and F Mortgage payments 1 year Sale to Freddie Fannie? |
| 1/7/2009 | M.A. | $ 207,920.00 | 3421 | 3830 E. Lakewood Pkwy, Unit 1113 Phoenix, AZ | | | 69.25 | p82 | May 8, 2015 WFB - Loan losses | "limited losses at this time" | $ 132,920.00 | Line 82, Wachovia | Date of foreclosure 7/20/2010, resell date 2/11/2011, sell amount $75,000 | Mortgage payments 1 year Sale to Freddie Fannie? |
| 11/3/2008 | N.A. | $ 199,920.00 | 57806 | 16013 S. Desert Foothill, (Unit 1115) Phoenix, AZ | | | 234.00 | p83 | May 8, 2015 WFB - Loan losses | "limited losses at this time" | $ 130,920.00 | Line 64 | Foreclosure 4/22/2010, resell 6/26/2010, resell amount $69,000 | Not foreclosed per Sked F Mortgage payments 4 years Sale to Freddie Fannie? |
| 11/21/2008 | WH | $ 248,800.00 | 6528, 3-708 | 16013 S. Desert Foothill, Unit 2116, Phoenix, AZ | | | 128,582.00 | A-72, p85 | May 11, 2015 WFB Email and 4/5/2018 | "loan loss figures" | $ 123,800.00 | Line 67 | Resell date 6/19/2013, $125,000, Loan $248,800 | Not foreclosed per Sked F Mortgage payments 4 years Sale to Freddie Fannie? |
| 5/1/2008 | S.M. | $ 228,000.00 | 2-708, 6852 | 4983 Towne Terrace, Kissimmee, FL | | 179,778.00 | | A-61, p86 | 4/5/2018 | Email from WFB, Campbell calculates loss | $ 171,100.00 | Line 9 | Foreclosure 2/14/2011, resell 7/11/2011, resell amount $56,900 | Mortgage payments 2 years? Sale to Freddie/Fannie? |
| 9/10/2008 | N.K. | $ 149,250.00 | 7-708, 8897 | 8434 Wakerga Road, #837 Antelope, VA Unit 238 | | 98,324.00 | | A-71, p.87 | 4/5/2018 | Email from WFB, Campbell calculates loss | $ 95,250.00 | Line 30 | Foreclosure 8/30/2010, resell 5/23/2011, resell amount $54,000 | Mortgage payments 2 years? Sale to Freddie/Fannie? |
| 1/20/2009 | A.K. | $ 178,000.00 | 9-708, 3829 | 8434 Wakerga Road, #837 Antelope, VA Unit 1121 | | 95,334.00 | | A-73 | 4/5/2018 | Email from WFB, Campbell calculates loss | $ 88,000.00 | Line 46 | Resell date 9/30/2010, $90,000, loan $178,000 | Not foreclosed per Sked F Mortgage payments 1 year Sale to Freddie Fannie? |
| **Totals** | | | | | $ 1,575,550.06 | $ 1,080,358.10 | $ 3,101.46 | | | | | | | |
| | | | | | | $ 128,582.00 | | | | | | | | |
| | | | | | | $ 179,778.00 | | | | | | | | |
| | | | | | | $ 98,324.00 | | | | | | | | |
| | | | | | | $ 95,334.00 | | | | | | | | |
| | | | | | | $ 502,018.00 | | | | | | | | |
| | | | | | | $ 2,077,568.06 | Reconciled | | | | | | | |

# EXHIBIT 4

| Line item | Address | Unit # | Approx. Settlement Date | Buyer/Borrower | Loan # | Loan Amount (not on Schedule A) | UPB (unpaid balance) | Loss Amount | BANA Notes on Spreadsheet (not on Sked A) | Foreclosure Date | Resell Date | Resell Amount | Loan Amount less resell amount | Line Reference | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | **Schedule A - Bank of America - 5/14/2018 ( pdf 89 to 99)** | | | **Schedule F - Alternative Calculation** | | | |
| 6 | 16013 S Desert Foothills PKWY, Phoenix AZ 85048 | 1026 | 11/5/2008 | I.O | #6882 | $ 200,000.00 | $ 198,860.29 | $ 106,007.00 | FHLMC makewhole combined with Fees Due Bookloss | 3/4/2010 | 5/26/2010 | $ 94,000.00 | $ 106,000.00 | Line 65 | No date of foreclosure or date of loss Sked A |
| 7 | 3830 E Lakewood PKWY, Phoenix, AZ 85048 | 3156 | 12/26/2008 | M.A. | 9430 | $ 212,720.00 | $ 211,034.06 | $ 142,162.00 | FHLMC makewhole combined with Fees Due Bookloss | 7/7/2010 | 1/12/2011 | $ 70,000.00 | $ 142,720.00 | Line 81 | Not date when sold to FNMA on Sked A |
| 8 | 5855 N Kolb Rd., Tucson, AZ | 10101 | 7/21/2009 | M.H. | 1816 | $ 182,790.00 | $ 182,416.37 | $ 58,318.00 | FHLMC makewhole combined with Fees Due Bookloss | 8/4/2010 | 3/10/2011 | $ 125,000.00 | $ 57,790.00 | Line 102 | No information on Sked F when BOA sells to FNMA |
| 9 | 8434 Walerga Rd, Antelope, CA | 138 | 10/31/2008 | N.K. | 7460/5524 | $ 159,200.00 | $ 157,802.71 | $ 103,796.00 | FHLMC makewhole combined with Fees Due Bookloss | 7/23/2010 | 12/31/2010 | $ 60,500.00 | $ 98,700.00 | Line 33 | No date on Sked A when "Make Whole" occurred |
| 10 | 3830 E Lakewood PKWY, Phoenix, AZ 85048 | 31(6)54 | 1/13/2009 | M.A. | 4463/1344 | $ 210,320.00 | $ 208,312.35 | $ 140,160.00 | FHLMC makewhole combined with Fees Due Bookloss | 7/9/2010 | 11/30/2010 | $ 76,500.00 | $ 133,820.00 | Line 84 | No description on Sked A of "loss" |
| 11 | 8434 Walerga Rd, Antelope, CA | 337 | 1/23/2009 | A. K. | 9844/7743 | $ 188,000.00 | $ 186,710.80 | $ 128,188.00 | FHLMC makewhole combined with Fees Due Bookloss | 6/23/2010 | 3/10/2011 | $ 65,000.00 | $ 123,000.00 | Line 43 | |
| 12 | 16013 S Desert Foothills PKWY, Phoenix AZ 85048 | 1040 | 4/22/2009 | J.S. | 1168/1627 | $ 211,200.00 | $ 210,187.51 | $ 135,506.00 | FHLMC makewhole combined with Fees Due Bookloss | 7/9/2010 | 2/28/2011 | $ 70,700.00 | $ 140,500.00 | Line 77 | |
| 13 | 8434 Walerga Rd, Antelope, CA | 832 | 5/5/2009 | G.A. | 3377/3139 | $ 176,250.00 | $ 174,078.51 | $ 117,345.00 | FHLMC makewhole combined with Fees Due Bookloss | 5/19/2011 | 1/25/2012 | $ 62,000.00 | $ 114,250.00 | Line 60 | |
| 14 | 8434 Walerga Rd, Antelope, CA | 133 | 5/13/2009 | S.F. | 8236 | $ 159,200.00 | $ 158,320.67 | $ 104,331.00 | FHLMC makewhole combined with Fees Due Bookloss | 7/19/2010 | 1/3/2011 | $ 58,000.00 | $ 101,200.00 | Line 61 | |
| 15 | 5855 N Kolb Rd., Tucson, AZ | 13104 (3104 | 6/11/2009 | R.E | 4929/0598 | $ 178,792.00 | $ 176,327.66 | $ 67,021.00 | FHLMC makewhole combined with Fees Due Bookloss | 4/28/2011 | 6/29/2011 | $ 119,000.00 | $ 59,792.00 | Line 93 | |
| 16 | 5855 N Kolb Rd., Tucson, AZ | 5104W | 6/12/2009 | W.E | 3202 | $ 178,792.00 | $ 177,409.87 | $ 78,338.00 | FHLMC makewhole combined with Fees Due Bookloss | 1/26/2011 | 5/25/2011 | $ 109,000.00 | $ 69,792.00 | Line 94 | |
| 17 | 5855 N Kolb Rd., Tucson, AZ | 1101 | 6/25/2009 | M.E. | 6351/2589 | $ 178,792.00 | $ 176,026.66 | $ 67,803.00 | FHLMC makewhole combined with Fees Due Bookloss | 5/8/2011 | 2/14/2013 | $ 117,500.00 | $ 36,992.00 | Line 97 | |
| 18 | 16013 S Desert Foothills PKWY, Phoenix AZ 85048 | 1116 | 7/16/2009 | J.S. | 4078/7362 | $ 224,925.00 | $ 224,507.24 | $ 163,495.00 | FHLMC makewhole combined with Fees Due Bookloss | 7/8/2010 | 8/8/2011 | $ 67,125.00 | $ 157,800.00 | Line 76 | |
| 19 | 5855 N Kolb Rd., Tucson, AZ | 3103 | 7/20/2009 | M.H. | 5033/8809 | $ 171,200.00 | $ 170,797.14 | $ 58,859.00 | FHLMC makewhole combined with Fees Due Bookloss | 7/28/2010 | 1/12/2011 | $ 122,500.00 | $ 48,700.00 | Line 101 | |
| 20 | 5855 N Kolb Rd., Tucson, AZ | 9210 | 7/27/2009 | A.E. | 4158/1238 | $ 159,000.00 | $ 158,324.23 | $ 68,832.00 | FHLMC makewhole combined with Fees Due Bookloss | 8/11/2010 | 3/23/2012 | $ 102,800.00 | $ 56,200.00 | Line 103 | |
| 21 | 5855 N Kolb Rd., Tucson, AZ | 6106 | 8/4/2009 | R.E | 8042 | $ 178,792.00 | $ 177,696.11 | $ 71,836.00 | FHLMC makewhole combined with Fees Due Bookloss | 2/3/2011 | 5/6/2011 | $ 115,150.00 | $ 63,642.00 | Line 108 | |
| 22 | 16013 S Desert Foothills PKWY, Phoenix AZ 85048 | 1016 | 11/7/2008 | N.A. | 5134 | $ 202,320.00 | $ 200,792.14 | $ 121,504.00 | BANA P&L losses combined with Fees Due bookloss | 3/15/2011 | 6/20/2011 | $ 87,500.00 | $ 114,820.00 | Line 66 | |
| 23 | 5855 N Kolb Rd., Tucson, AZ | 6105 | 5/22/2009 | M.C. | 7171/4755 | $ 157,592.00 | $ 158,610.49 | $ 69,631.00 | BANA P&L losses combined with Fees Due bookloss | 8/25/2010 | 8/25/2011 | $ 95,000.00 | $ 62,592.00 | Line 91 | |
| 24 | 5855 N Kolb Rd., Tucson, AZ | 6104 | 6/15/2009 | V.E | 6737/5637 | $ 178,792.00 | $ 177,201.01 | $ 83,902.00 | BANA P&L losses combined with Fees Due bookloss | 7/2/2011 | 10/7/2011 | $ 102,000.00 | $ 76,792.00 | Line 95 | |
| 25 | 5855 N Kolb Rd., Tucson, AZ | 10102 | 7/7/2009 | F.M. | 6045 | $ 157,592.00 | $ 67,026.62 | $ 67,026.00 | BANA P&L losses combined with Fees Due bookloss | 9/4/2013 | 9/4/2013 | $ 93,100.00 | $ 64,492.00 | Line 98 | |
| 26 | 5855 N Kolb Rd., Tucson, AZ | 1105 | 7/27/2009 | H.K. | 4272/6600 | $ 153,600.00 | $ 153,141.93 | $ 66,466.00 | BANA P&L losses combined with Fees Due bookloss | 8/5/2011 | Unclear | | | Line 104 | |
| Total Loss | | | | | | | | $ 2,020,526.00 | | | | | $ 1,829,594.00 | | |